*726 Opinion for the court filed by Circuit Judge TARANTO, in which Chief Judge PROST and Circuit Judges NEWMAN, LOURIE, MOORE, O’MALLEY, REYNA, WALLACH, CHEN, and STOLL join. Dissenting opinion filed by Circuit Judge DYK, in which Circuit Judge HUGHES joins.
TARANTO, Circuit. Judge.
Congress has declared: “Except as otherwise provided in [the Patent Act], whoever, without authority makes, uses, offers to. sell, or sells any patented invention, within the United States or imports -into the United States any patented invention during the term of the patent therefor, infringes the patent.” 35 U.S.C. § 271(a); see id. § 154(a) (granting patentee “right to exclude others” from itemized actions). The doctrine of patent exhaustion (or “first sale” doctrine) addresses the circumstances in which a sale of a patented article (or' an article sufficiently embodying a patent), when the sale is made or authorized by the patentee,'confers on the buyer the “authority”’to engage in acts involving the article, such as resale, that are infringing acts in the absence of such authority. There is nothing “otherwise provided!’ on the issue in the Patent Act. In that respect, the Patent Act differs from the Copyright Act,, whose infringement, importation, and exclusive-rights provisions, 17 U.S.C. §§ 501, 602,106, are all subject to a separate, overriding statutory provision that grants owners of certain copyrighted articles a right to sell those articles “without the authority” of the copyright holder, id. § 109(a).
In this case, all of the initial sales at issue were made by the U.S. patentee, rather than by a licensee having authorization from the patentee. Some .of the initial sales were made domestically, some abroad. All of the domestic sales, and an unknown portion of the foreign sales, were accompanied- by clearly communicated restrictions on the buyer’s reuse and resale.
We decided to hear this ease en banc to consider whether two decisions of this court concerning the uncodified doctrine of patent exhaustion—one decision from 1992, the other from 2001—remain sound in light of later decisions of the Supreme Court. Today we reaffirm the principles of our earlier decisions.
First, we adhere to the holding of Mallinckrodt, Inc, v. Medipart, Inc., 976 F.2d 700 (Fed.Cir.1992), that a patentee, when selling a patented article subject to a.single-use/no-resale restriction that is lawful and clearly communicated to the purchaser, does not by that sale give the buyer, or downstream buyers, the resale/reuse authority that has been expressly denied. Such resale or reuse, when contrary to the known,, lawful limits on the authority conferred at the time of the original sale, remains- unauthorized and therefore remains infringing conduct under the terms of § 271. Under Supreme Court precedent, a patentee may preserve its § 271 rights through such restrictions when licensing others to make and sell patented articles; Mallinckrodt held that there is no sound legal basis for denying the same ability to the patentee that makes and sells the articles itself. We find Mallinckrodt’s principle to remain sound after the Supreme Court’s decision in Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008), in which the Court did not have before it or address a patentee sale at all, let alone one made subject to a restriction, but a sale made by a separate manufacturer under a patentee-granted license conferring unrestricted authority to sell.
Second, we adhere to the holding of Jazz Photo Corp,. v. International Trade Comm’n, 264 F.3d 1094 (Fed.Cir.2001), *727 that a U.S. patentee, merely-by selling or authorizing the sale of a U.S.-patented article abroad, does not authorize the buyer to import the article and sell and use it in the United States, which are infringing acts in the absence of patentee-conferred authority. Jazz Photo’s no-exhaustion ruling recognizes that foreign markets under foreign sovereign control are not equivalent to the U.S. markets under U.S. control in which a U.S. patentee’s sale presumptively exhausts its rights in the article sold. A buyer may still rely on a foreign sale as a defense to infringement, but only by establishing an express or implied license—a defense separate from exhaustion, as Quanta holds—based on patentee communications or other circumstances of the sale. We conclude that Jazz Photo’s no-exhaustion principle remains sound after the Supreme Court’s decision in Kirtsaeng v. John Wiley & Sons, Inc., — U.S. —, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013), in which the Court did not address patent law or whether a foreign sale should be viewed as conferring authority to engage in otherwise-infringing domestic acts. Kirt-saeng is a copyright case holding that 17 U.S.C. § 109(a) entitles owners of copyrighted articles to'take certain acts “without the authority” of the copyright holder. There is no counterpart to that provision in the Patent Act, under which a foreign sale is properly treated as neither conclusively nor even presumptively exhausting the U.S. patentee’s rights in the United States.
Background
The relevant facts are set forth in the limited record that the parties agreed was determinative of the result. Lexmark International, Inc. makes and sells printers as well as toner cartridges for its printers. Lexmark owns a number of patents that cover its cartridges and their use. The cartridges at issue here were first sold by Lexmark, some abroad and some in the United States. Some of the foreign-sold cartridges and all of the domestically sold cartridges at issue were sold, at a discount, subject to an express single-use/no-resale restriction. Impression Products, Inc. later acquired the cartridges at issue in order to resell them in the United States— the restricted ones after a third party physically modified them to enable re-use in violation of the single-use/no-resale restriction. Impression has resold the patented Lexmark cartridges at issue in the United States, and has imported those it acquired abroad. In each case, it has acted without affirmative authorization from Lexmark and, for the restricted cartridges, in violation of the express denial of authorization to engage in resale, and reuse. Impression’s actions infringe under 35 U.S.C. § 271—unless the fact that Lexmark ini-, tially sold the cartridges constitutes the grant of authority that makes Impression’s later resale and importation non-infringing under the doctrine of exhaustion. Whether Lexmark’s initial sales have that effect raises two questions—one regarding the single-use/no-resale restricted sales (wherever they, occur), the other regarding the initial foreign sales of all cartridges, whether restricted or not.
A
Lexmark offers buyers a choice. A buyer may purchase a “Regular Cartridge” at full price, in which case the buyer is not subject to any sale terms restricting reuse or resale of the cartridge. Alternatively, a buyer may purchase a “Return Program Cartridge” at a discount of roughly 20 percent, .subject to a single-use/no-resale restriction: the buyer may not reuse the cartridge after the toner runs out and may not transfer it to anyone but Lexmark once it is used, ie., the buyer must “re *728 turn” the cartridge “only” to Lexmark. J.A. 2559.[1] Lexmark and Impression stipulated in this case that the reduced price “reflects the value of the property interest and use rights conveyed to the purchaser under the express terms of the conditional sale contract and conditional single-use license conferred by Lexmark.” Id. The stipulation adds that “Lexmark has an express and enforceable contractual agreement with- each of its end-user customers.” J.A. 2562. And it is undisputed that all end users receive adequate notice of the restriction supporting the discounted price before they make their purchases.
The distinctness of the options for buyers, which produce different revenues for Lexmark, is not just a matter of different terms of sale. It also is reflected in a microchip in the cartridges that, among other things, communicates with the printer. For a Return Program cartridge, the chip and printer, by monitoring toner levels, prevent use of a' refilled cartridge. For a Regular cartridge, the toner can be replenished' and the cartridge reused. J.A. 2559-60. “To circumvent this technological measure,” however, “third parties have ‘hacked’ Lexmark’s microchips and created their own' ‘unauthorized replacement’ microchips” that, when installed in a Return Program cartridge, fool the printer into allowing reuse of that cartridge. J.A. 2560. It is undisputed that various companies gather spent cartridges, replace the microchips, refill and “remanufacture” the cartridges, and sell them to resellers like Impression for marketing to consumers for use with Lexmark printers.
Lexmark sells its cartridges in two channels of distribution. It sells directly to end users,'and it sells to “re-sellers” (including wholesalers, dealers, and distributors). Lexmark offers the options of Return Program and Regular cartridges in both channels; the resellers pay less for the Return Program cartridges; and the single-use/no-resale restriction applies to the resale by resellers. J.A. 2564. There is no dispute about the adequacy of notice to resellers as well as end users or the binding nature of the Lexmark-reseller agreements. J.A. 2562-64. When Lex-mark sells its cartridges to end users, that sale is the first sale; when it sells to resellers, that sale is the first sale. When a reseller subsequently sells to end users, that sale is not the first sale.
B
Lexmark sued Impression, among other companies, for infringement under 35 U.S.C. § 271. It alleged that Impression acquires spent cartridges, including some Return Program cartridges that have been altered by chip replacement and toner refilling, then sells them in the United States and, for the foreign-bought ones, imports them into the United States.[2] For a large number of patents directly covering the cartridges, Lexmark alleged direct infringement under § 271(a). For a few patents that only the end user directly infringes, Lexmark alleged that Impression is liable for contributory infringement under § 271(c). The operative complaint states the infringement allegations in a *729 single count (Count I), covering past arid continuing activity.
More specifically, the infringement allegations are limited to two groups of cartridges. One group consists of Return Program cartridges that Lexmark sold in the United States under the restriction denying authority for resale and reuse. As it later made clear, Lexmark did not allege infringement by Impression’s, actions involving Regular cartridges Lex-mark had first sold domestically. J.A. 1895-97, 2557. The second group consists of all cartridges that Lexmark sold abroad, including Return Program and Regular cartridges. It is. undisputed that Lexmark never granted anyone permission to import those cartridges into, or sell or use them in, the United States.
C
The litigation progressed to the point at which no defendant remained except Impression, and only the single count of infringement remained against Impression. Impression came to agree that the patents covered the cartridges it was importing and selling, and it did not dispute the validity or enforceability of the patents. -It contested liability for infringement on just one ground, namely, that Lexmark had exhausted its U.S. patent rights in the cartridges by its initial sales of them.
Three defining aspects of Impression’s contention to the district court, and presentation to us, are worth noting here, because they narrow our focus. First, we discuss only Lexmark’s sales to end users (and the resales and reuses deriving from those sales), because neither party has made an argument for distinguishing Lex-mark’s sales to resellers. ¡Second, we take as a premise that both the first purchaser and Impression as a re-purchaser had adequate-notice of the single-use/no-resale restriction before they made their purchases; the adequacy of that notice is unchallenged. Thus, we do not have before us the questions that would arise, whether under principles governing bona fide purchasers or otherwise, if a downstream re-purchaser acquired a patented article with less than actual -knowledge of such a restriction. Third, Impression has not contended that the particular restriction at issue gives rise to a patent-misuse defense, constitutes an antitrust violation,' or exceeds the scope of the Patent Act’s express grant of exclusive rights over patented articles, 35 U.S.C. §§ 154, 271. Rather, Impression contends that, although there is no other illegality or breach of statutory limits identified, the single-usd/no-resale restriction is to be disregarded for exhaustion purposes. According to Impression, it has the authority to resell despite the known denial' of such’authority-by Lex-mark for the Return Program cartridges.
Impression presented its exhaustion der fense by filing motions,to dismiss the infringement count, one motion for each of the two groups of cartridges at issue.' For each motion, Impression ’did not contest that, under this court’s governing law, its exhaustion defense must fail: Mallinckrodt for the cartridges initially sold in the United States, Jazz Photo for the cartridges initially sold abroad. But it argued that the Supreme Court’s more recent decisions had made Mallinckrodt and Jazz Photo no longer good law. In a pair of opinions issued the same day, the district court agreed with Impression about Mallinckrodt but disagreed about Jazz Photo.
1
. The district court granted Impression’s motion to dismiss Lexmark’s claim of infringement involving the single-use cartridges Lexmark had first sold in the United States. Lexmark Int’l, Inc. v. Ink Techs. Printer Supplies, LLC, No. 1:10- *730 CV-564, 2014 WL 1276133 (S.D.Ohio Mar. 27, 2014) (Domestic Sale Opinion), modified at J.A. 34-35 based on a joint stipulation of the.parties, J.A. 2554-66. Like Impression, the court recognized that there is no exhaustion here under this court’s decision in Mallinckrodt, which rejected an, exhaustion defense in circumstances similar to those presented here— namely, where a patentee sold a patented article subject to an otherwise-unobjectionable single-use restriction. Id. at *4, *6. And. the court recognized this court’s post-Mallinckrodt decisions as reiterating that a “ ‘conditional sale’ ” of that type does not cause exhaustion of the patentee’s preserved rights in the article. Id. at *4, *6 (quoting Princo Corp. v. Int’l Trade Comm’n, 616 F.3d 1318, 1328 (Fed.Cir. 2010) (en banc)).
In nevertheless finding exhaustion here, the district court examined a number of Supreme Court decisions on patent exhaustion. It noted the Court’s explanation in Bloomer v. McQuewan, 55 U.S. (14 How.) 539, 549-50, 14 L.Ed. 532 (1853), that a patentee’s grant of a license to another to make and sell a patented article is not the same thing as the. patentee’s sale of the article itself. Domestic Sale Opinion, 2014 WL 1276133, at *3. It noted, too, tfie Court’s rejection of an exhaustion defense in General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, opinion on rehearing at 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938), which held that a buyer of a patented article infringéd when it used the article in a way forbidden by a known use restriction, having bought the article from a manufacturer licensed by the pat-entee to make and sell the article only to buyers who complied with the use restriction. Domestic Sale Opinion, 2014 WL 1276133, at *3. The district court also noted that the Supreme Court in Quanta found exhaustion where “the Supreme Court determined that the agreements [at issue] broadly authorized Intel [the seller] to sell the licensed products without restrictions or conditions.” Id. at *5 (emphasis added).
Despite that recognition of what Quanta involved; the district court concluded “that Quanta overruled Mallinckrodt sub silentio.” Id. at *5, *6. Although Return Program cartridges were sold under post-sale restrictions on reuse and resale, the district. court held that “those post-sale use restrictions do not prevent patent rights from being exhausted given that the initial sales were authorizéd and unrestricted.” Id. The court thus dismissed the infringement claim regarding Impression’s actions involving Return Prógram cartridges Lexmark had sold in the United States. Id. at *7.
2
As to • cartridges Lexmark had sold abroad, the court held that exhaustion did not .apply, i.e„ did not render Impression’s imports and domestic resales of those cartridges. non-infringing. Lexmark Int’l, Inc. v. Ink Techs. Printer Supplies, LLC, 9 F.Supp.3d 830 (S.D.Ohio 2014) (Foreign Sale Opinion). The court recognized, and Impression did. not. dispute, that “under Jazz Photo, an initial authorized sale of a patented product outside of the United States would not exhaust the patent rights of the patent holder.” Id. at 833. It then examined the Supreme Court’s decision in Kirtsaeng and rejected impression’s contention that Kirtsaeng “overturns the Federal Circuits decision in Jazz Photo, 264 F.3d 1094, such that Lexmark’s patent rights were exhausted upon the first authorized sale abroad.” Foreign Sale Opinion, 9 F.Supp.3d at 834 (footnote omitted).
The court stated that “[t]he Supreme Court’s decision was rooted in interpreta *731 tion of a statutory provision of copyright law,” namely, 17 U.S.C. § 109(a). Foreign Sale Opinion, 9 F.Supp.3d at 833. The district court noted the absence from Kirtsaeng of any discussion of exhaustion in the patent field and the Supreme Court’s longstanding recognition that copyright law and patent law are not interchangeable. Id. at 835 (citing Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 346, 28 S.Ct. 722, 52 L.Ed. 1086 (1908)). It added.that Kirt-saeng “is rooted in statutory and -legislative interpretation of section 109(a) of the Copyright Act,” but “[njoticeably absent from patent law is a codification of the exhaustion doctrine,” concluding: . “the core statutory text that weighed in favor .-of a non-geographical interpretation is nonexistent in the context of patent law.” Id. The Patent Act, the . court concluded, calls for its own analysis of “context, history and practical considerations.” Id. at 836.
For those reasons, while recognizing that this court might reconsider Jazz Photo in light of Kirtsaeng, the district court held that Jazz Photo remains good law. Id. at 837-38. The court therefore denied Impression’s motion to dismiss Lexmark’s claim of infringement involving the Foreign-Sold Cartridges. Id. at 838.
3
Soon thereafter, with the parties’ agreement, the court entered á “Stipulated Final Judgment.” J.A. 1. The judgment was (a) for-Impression (i.e., Impression does not infringe) as- to the Return Program cartridges whose precursors Lexmark had sold in the United States and (b) for Lexmark (i.e., Impression infringes) as to cartridges whose precursors Lexmark had initially sold abroad. Id. The- parties agree that the judgment is final under 28 U.S.C. § 1295(a)(1), even as to cartridges ‘found to infringe.
. In agreeing to the final judgment of infringement as to the foreign-sold cartridges, which remained an open issue after the Rule 12(b)(6) rulings, Impression reasonably construed the - district court’s Jazz Photo ruling to foreclose its exhaustion defense,-even though all the district court had done was to deny Impression’s request for judgment in its favor based on that defense. In particular, the district court’s rationale, as to the unavailability of exhaustion did not depend on the facts in the record that Lexmark identifies as suggesting the “regional’.’ character of its foreign-sold cartridges, facts that .therefore went unexplored in the district court. And, notably, when Impression agreed to a judgment of infringement as to foreign-sold cartridges, it did not preserve an implied-license defense, even though the Supreme Court made clear , .in Quanta the distinctness, .of implied-license and exhaustion defenses. 553 U.S. at 637, 128 S.Ct. 2109.
D
Impression appealed and Lexmark cross-appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(1). The parties submitted briefs ...and presented oral argument to a panel of this court, focused on whether Quanta had stripped Mallinckrodt of its controlling force and whether Kirtsaeng had stripped Jazz Photo of its controlling force.
Shortly after oral argument, this court sua sponte took the case en banc. Lexmark Int’l, Inc. v. Impression Prods., Inc., 785 F.3d 565 (Fed.Cir.2015). We directed the parties to address the following issues:
(a) The case involves certain sales, -made abroad, of articles patented in the United States. In light of Kirtsaeng v. John Wiley & Sons, Inc., 133 S.Ct. 1351 (2013), should this court overrule Jazz Photo Corp. v. International Trade *732 Commission, 264 F.3d 1094 (Fed.Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion[?]
(b) The case involves (i) sales of patented articles to end users under a restriction that' they use the articles once and then return them and (ii) sales of the same patented articles to resellers under á restriction that resales take place under the single-use-and-retum restriction: Do any of those sales give rise to patent exhaustion? In light of Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 128 S.Ct. 2109 (2008), should this court overrule Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed.Cir.1992), to the extent it ruled that a sale of a patented article, when the sale-is made under a restriction that is otherwise lawful and within the scope" of the patent grant, does not give rise to patent exhaustion?
Id. at 566.
Discussion
I
The Patent Act’s language defines the framework within which the two exhaustion questions arise. In 1952, based on pre-existing uneodified understandings, Congress set forth a statutory prescription of what constitutes patent “infringement.” See Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 483-84, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (Aro II); Aro I, 365 U.S. at 341-42 & n. 8, 81 S.Ct. 599. In its current form, which includes a bar on importation and offers to sell added by a 1994 enactment, § 271(a) states that, unless another provision of the Act provides otherwise, whoever “without authority” during the term of a patent commits certain acts—“makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention”—“infringes the patent.” 35 U.S.C. § 271(a).
Section 271(a) connects “make,” “sell,” “use,” and the other terms with the disjunctive “or,” as does the related provision granting the patentee various rights to exclude others from the same activities, id. § 154(a). Congress has' thus prescribed that whoever, “without authority,” does any one of the listed acts—“the making, using, offering to sell, selling, or importing of a patented invention,” Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 131 S.Ct. 2060, 2065, 179 L.Ed.2d 1167 (2011) (emphasis added)—is an infringer. See 5 Donald S. Chisum, Chisum on Patents § 16.01 (2015) (“The exclusive rights are disjunctive: one may infringe by (1) making without selling or using, (2) using without making or selling or (3) selling without making or using.”) (footnote omitted); William C. Robinson, The Law of Patents §§ 903-906 (1890). The government observes: “Nothing in the text of the Patent Act expressly prevents a patentee from demanding compensation from each downstream user or reseller of an article embodying his invention.” U.S. Br. 5.
Section 271(a)’s language embodies an understanding of “infringement” that was long recognized even before Congress enacted § 271 as part of the 1952 recodification of the patent laws. The pre-1952 statute included a right-to-exelude provision comparable to § 154, which, in language that varied over time, gave the patentee a right to exclude others (not a right to practice the invention). See 35 U.S.C. § 40 (1946); Rev. Stat. § 4884; Bauer & Cie. v. O’Donnell, 229 U.S. 1, 9-10, 33 S.Ct. 616, 57 L.Ed. 1041 (1913); 5 Chisum § 16.02[1]. But while the pre-1952 statute provided for actions for “infringement,” e.g., 35 U.S.C. §§ 67, 70 (1948); Rev. Stat. §§ 4919, 4921, there was no provision pre *733 scribing what constitutes infringement. Nevertheless, the courts consistently understood infringement' to mean what § 271 came to say—committing the identified acts without authority (synonymously, without consent or permission): “The infringement of a patent, being the invasion of this exclusive right, therefore consists in the manufacture, usé, or sale of the invention protected by the patent within the area and time described in the patent, by any person not duly authorized to do so by the patentee.” Robinson, § 890, at 43-44 (emphasis added); see 3 Anthony William Deller, Walker on Patents § 450, at 1681 (1937) (“An infringement is the unauthorized making or using or selling of the patented invention.”).[3] Thus, the 1952 Act’s “without authority” language simply codifies an authority requirement long recognized to- be the meaning of “infringement” of the enumerated rights to exclude. See Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 26-27, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (§ 271(a) left direct-infringement law intact); Aro II, 377 U.S. at 483, 84 S.Ct. 1526; Aro I, 365 U.S. at 342, 81 S.Ct. 599; Giles S. Rich, Infringement Under Section 271 of the Patent Act of 1952, 21 Geo. Wash. L.Rev. 521, 537 (1953).
The requirement of “authority” in order to avoid infringement, in its natural meaning, refers to a grant of permission. Logically, permission -might come from Congress, whether outside the Patent Act or within the Patent Act itself, as reflected in § 271(a)’s “[e]xcept as otherwise provided in [the Patent Act]” language, which explicitly, bows to other contrary sections of the Patent Act. But it is undisputed that no other statutory provision applies in this case. See U.S. Br. 5; compare 35 U.S.C. § 262 (each joint owner of a patent may engage in making, using, selling, offering to sell, and importing, without authority from other owners). Nothing in the Act supersedes the § 271 requirement of authority from the patentee before a person in Impression’s position may engage in the itemized acts without infringing.
In this respect, the Patent Act differs from the Copyright Act. In the copyright statute, Congress included a provision giving a right of sale to certain article owners, 17 U.S.C. § 109(a), and made the infringement, importation, and exclusive-rights provisions all subservient to that express guarantee.[4] The Patent Aet does not con *734 tain a congressionally prescribed exhaustion rule, let alone a provision that makes the express definition of infringement and rights to exclude (both of which now encompass importation) subservient to any congressionally expressed exhaustion rule.[5]
In the Patent Act, then, as relevant here, it is a conferral of “authority” by the patentee that is needed in order for the actions listed in § 271(a) not to constitute infringement. As the government says, noting the parallelism of § 271(a) and the § 154(a) grant of rights to exclude, what § 271(a) meáns is that “[wjhoever does any of these acts ‘without authority’ from the patentee infringes the patent.” U.S. Br. 1 (emphasis added).' In brief: § 271(a) by its terms requires that whoever engages in the enumerated acts receive permission from the patentee (directly or indirectly) for the acts being performed, which otherwise áre infringing; and nothing in § 271(a) constrains the patentee’s choices about whom to grant the required authority, if anyone, or about which acts (of manufacture, use, sale, etc.) to authorize, if any.
Congress defines the existence and scope of patent rights. See, e.g., Octane Fitness, LLC v. ICON Health & Fitness, Inc., — U.S. —, 134 S.Ct. 1749, 1755-56, 188 L.Ed.2d 816 (2014); Crown Die & Tool Co., 261 U.S. at 40, 43 S.Ct. 254; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 423, 28 S.Ct. 748, 52 L.Ed. 1122 (1908). Unless Congress has directed the courts to fashion governing rules in a particular statutory context- (as in, e.g., the Sherman Act), “once Congress addresses- a subject, even a subject previously governed by federal common law, the justification for lawmaking by-the federal courts is greatly diminished. Thereafter, the task of the federal courts is to interpret and apply statutory law, not to create common law.” Northwest Airlines, Inc. v. Transp. Workers Union of Am., 451 U.S. 77, 95 n. 34, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); see City of Milwaukee v. Illinois, 451 U.S. 304, 315, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (“Our commitment to the separation of powers is too fundamental to continue to rely on federal common law by judicially decreeing what accords with common sense and the public weal when Congress has addressed the problem”) (internal quotation marks omitted); Am. Elec. Power Co. v. Connecticut, 564 U.S. 410, 131 S.Ct. 2527, 2537, 180 L.Ed.2d 435 (2011).
If ordinary congressional supremacy is to be respected, exhaustion doctrine in the Patent Act must'be understood as an interpretation of § 271(a)’s “without authority” language. And so it has been understood: some sales confer authority on the purchaser to take certain actions—such as selling or using the purchased article in the United States or importing it into the United States—that would otherwise be infringing acts. See 5 Chisum § 16.03[2][a], at 16-362.8; U.S. Br. 1 (tying exhaustion to “authority” language of § 271(a)). We decide here (a) whether a sale, even though accompanied by a clearly communicated and otherwise-lawful denial of such authority, nonetheless has the legal effect of conferring such authority and (b) whether a foreign sale has the legal effect of conferring such authority where (as we must assume at present in this case) neither a grant nor a reservation of § 271(a) *735 rights was communicated to the purchaser before the foreign sale.[6]
II
The Mallinckrodt issue has been framed for us in clear terms. Suppose that Lex-mark had granted another firm a nonexclusive license to make and sell Return Program cartridges. It is undisputed and clear under Supreme Court- precedent— most prominently, the 1938 decision in General Talking Pictures—that Lexmark would not have exhausted its patent rights in those cartridges, upon the manufacturing licensee’s sale (the first sale), if a buyer with knowledge of the restrictions resold or reused them in violation of the restrictions. Impression and the government contend that a different result is required—that Lexmark automatically lost its patent rights—simply because Lex-mark sold the Return Program cartridges itself, subject to the same communicated restriction, rather than having left, the manufacture and sale to others under license. See U.S. Br. 7, 8, 10, 11 (case turns on distinction between patentee sale and non-patentee licensee sale). (Impression has left the en banc briefing on this issue largely to the government.)
.We conclude otherwise, as we did in Mallinckrodt and subsequent decisions. A sale made under a clearly communicated, otherwise-lawful restriction as to post-sale use or resale does not confer on the buyer and a subsequent purchaser the “authority” to engage in the use or resale that the restriction precludes. And there is no sound reason, and no Supreme Court precedent, requiring a distinction that gives less control to a practicing-entity patentee that makes and sells its own product than to a non-practicing-entity patentee that licenses others to make and sell the product.
A
Mallinckrodt involved a patentee’s sale of its medical device to hóspitáls, subject to a “single use only” restriction. The device consisted of a nebulizer and associated components for délivéring to a pátient, for diagnosis or treatment of lung diseases, a mist of radioactive or therapeutic material. It also trapped radioactive or toxic material when the patient exhaled. Mallinckrodt sold it under the single-use condition and with instructions for post-use disposal in a lead-shielded container. But some hospital purchasers instead sent used devices to Medipart for reconditioning and for replacement of certain compo *736 nents. When Mallinckrodt sued Medipart for direct and indirect infringement by-virtue of the reuse in violation of the single-use restriction, the district court granted Medipart summary judgment of non-infringement, concluding that Mallinck-rodt’s sale of the devices exhausted its ability to assert its patent rights in the units sold. 976 F.2d at 701-02.
This court reversed. Id. at 709. The court stated its ruling: “The restriction here at issue does not per se violate the doctrine of patent misuse or the antitrust law. Use in violation of a valid réstriction may be remedied under the patent law, provided that no other law prevents enforcement of the patent.” Id. at 701.
In explanation, the court observed that the patent grant of .§ 154 is a “right to exclude,” which “may be waived in whole or in part,” “subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse.” Mallinckrodt, 976 F.2d at 703. It noted that the Supreme Court had held that two particular types of restrictions in sales exceeded the legitimate scope of patent rights, so that the patentee did not retain its patent rights against, a buyer’s sale or use of a patented article in violation of those particular conditions: resale-price-maintenance -conditions, Bauer, 229 U.S. 1, 33 S.Ct. 616; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866 (1917); Boston Store of Chicago v. American Graphophone Co,, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551 (1918), and tying arrangements requiring use of non-patented articles with the patented one, Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). Mallinckrodt, 976 F.2d at 704. The Mallinckrodt court explained that those cases “did not hold, and it did not follow, that all restrictions accompanying the sale of patented goods were deemed illegal.” Id.
The court then described the key Supreme Court precedent, General Talking Pictures. As the Mallinckrodt court observed, in General Talking Pictures “the patentee had authorized the licensee to make and sell amplifiers embodying the patented invention for a specified use (home radios)/’ and “[t]he. defendant had purchased the patented amplifier from the manufacturing licensee, with knowledge of the patentee’s restriction on use,” but used it contrary to the. restriction. Id. at 705. The Supreme Court held that the defendant was liable for infringement; it “observed that a restrictive license to a particular use was permissible, and treated the purchaser’s unauthorized use as infringement of the patent.” Id, This court noted that the Supreme Court in General Talking Pictures “did not decide the situation where the patentee was the manufacturer” and seller. Id. This court then held that to distinguish the patentee sale (at issue in Mallinckrodt) from the licensee sale (at issue in General Talking Pictures) would be to make “formalistic distinctions of no economic consequence.” Id.
Finally, the court described “a group of cases in which the Supreme Court considered and affirmed the basic principles that unconditional sale of a patented device exhausts the patentee’s right to control the purchaser’s use of the device; and that the sale of patented goods, like other goods, can,.be conditioned.” Id. at 706. This court noted that, insofar as several cases ruling against patentees’ claims discussed or involved sales, the sales were not made under restrictions as to use. Id. at 707 (discussing Bloomer, 55 U.S. (14 How.) 539; Adams v. Burke, 84 U.S. (17 Wall.) 453, 21 L.Ed. 700 (1873); Keeler v. Standard Folding Bed Co., 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848 (1895)). The court *737 also noted the statement in Mitchell v. Hawley that “[s]ales of the kind may be made by the patentee with or without conditions,” 83 U.S. (16 Wall.) 544, 548, 21 L.Ed. 322 (1873), and the holding of Mitchell that a purchaser of a patented machine “licensed for use only during the original term of the patent” was liable for infringement for using the machine past that term when the patent term was extended. 976 F.2d at 707.
The court in Mallinekrodt concluded that “[u]nless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law, e.g., United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)), private parties retain the freedom to contract concerning conditions of sale.” 976 F.2d at 708. Thus, unless á sale restriction is improper under some other body of law, whether within the Patent Act or outside it, a patentee’s own sale of its patented article subject to a clearly communicated restriction does not confer authority to sell or use the article in violation of that restriction, i.e., does not exhaust the patentee’s § 271 rights against such conduct involving that article. Since Mallinckrodt, we have followed that principle. B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1426 (Fed.Cir.1997); Princo Corp. v. Int’l Trade Comm’n, 616 F.3d 1318, 1328 (Fed.Cir.2010) (en banc).
B
The district court concluded in this case that Quanta overturned t}ie Mallinekrodt rule as to a patentee’s sale of a patented article subject to a clearly communicated single-use/no-resale restriction. But no issue as to such a sale was presented for decision or decided in Quanta. And the Supreme Court in Quanta did not address the distinction between patentee sales and licensee sales on which the argument for overturning Mallinekrodt rests.
Quanta did not involve a patentee’s sale at all, let aloné one subject to a restriction or, more particularly, a single-use/no-resale restriction. Quanta involved a sale made (to computer maker Quanta) not by the patentee (LGE) but by a manufacturing licensee (chip maker Intel), which the patentee, had authorized to make and sell thé articles at issue (chips for installation in computers that would then be covered by LGE’s patents). 553 U.S. at 623-25, 128 S.Ct. 2109. And the patentee’s authorization to the licensee to make (the first) sales was not subject to any conditions, much less conditions to be embodied in those sales. Id. at 636-38, 128 S.Ct. 2109. While Intel had certain other contractual obligations to LGE regarding notice to Intel’s purchasers, neither party contended that Intel breached those obligations, and in any event, the Court repeatedly stated that the relevant LGE-Intel contract gave Intel an unrestricted authorization to sell the articles. Id. at 636-37, 128 S.Ct. 2109 (“Intel’s authority to sell its products embodying the LGE Patents was not conditioned on the notice or on Quanta’s decision to abide by LGE’s directions in that notice.”); id. at 637, 128 S.Ct. 2109 (“The License Agreement authorized Intel to sell producís that practiced the LGE Patents. No conditions limited Intel’s authority to sell products substantially embodying the patents.”); id. at 638, 128 S.Ct. 2109 (“Nothing in the License' Agreement limited' Intel’s ability to sell its products practicing the LGE Patents.”).
In short, Quanta did not involve the issue presented here. The facts defining the issues for decision, and the*issues decided, were at least two steps removed from the present case. There were ho *738 patentee sales, and there were no restrictions on the sales made by the licensee.
The two main issues decided by the Court in Quanta have no bearing on the issue of restricted sales by a patentee. The Court decided that exhaustion applies to method claims. Id. at 628-30, 128 S.Ct. 2109. And the Court decided “the extent to which a product must embody a patent in order to trigger exhaustion.” Id. at 630, 128 S.Ct. 2109; see id. at 630-35, 128 S.Ct. 2109.
Only the third issue addressed by the Court in Quanta concerns restrictions on sales—though not patentees’ sales—and the Court’s discussion of that issue does not undermine Mallinckrodt’s ruling that a patentee can preserve its patent rights through restrictions on its sales. As just described, when LGE invoked precedent such as General Talking Pictures that make clear that patentees are able to preserve their patent rights through restrictions on the sales they authorizes licensees to make, Quanta, 553 U.S. at 636, 128 S.Ct. 2109, the Court’s response was to conclude that there simply were no such restrictions on LGE’s grant to Intel of the authority to sell. Id. at 636-38, 128 S.Ct. 2109. The Court thus had prominently in view the principle that, through at least one path,, a patentee can reserve its patent rights through sale restrictions. The Court found the principle inapplicable to the case before it because of the absence of any restriction, and the Court said nothing to cast doubt on the principle. Indeed, the Court indirectly underscored the principle when it quoted Motion Picture Patents as stating “the rule” of exhaustion in terms expressly based on an “‘unconditional sale.’” Quanta, 553 U.S. at 626, 128 S.Ct. 2109 (quoting Motion Picture Patents, 243. U.S. at 516, 37 S.Ct. 416). And the Court did not consider whether or decide that the principle was limited to contracted-out, as distinguished from in-house, manufacturing and sales, or even recognize and discuss such a distinction.
Inferring disapproval of Mallinckrodt by the Supreme Court in Quanta is unwarranted for another reason. The decision of this court under review in Quanta relied centrally on Mallinckrodt and its successor case, B. Braun Medical. See LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1370 (Fed.Cir.2006). In the Supreme Court, the government prominently featured an argument that Mallinckrodt was incorrect and should be repudiated, U.S. Amicus Brief at 18-24, Quanta (No. 06-937), 2007 WL 3353102, and Quanta presented similar criticisms of Mallinckrodt, Brief for Petitioner at 13, 30-33, Quanta (No. 06-937), 2007 WL 3276505. Yet the Supreme Court said nothing about Mallinckrodt or B. Braun Medical. The evident explanation is that, at a minimum, no question was presented for decision—or was being decided—as to the effect a restriction on the first sale, whether made by a patentee or by a manufacturing licensee, would have on preservation of § 271, rights.
C
, For the foregoing reasons, the challenge to Mallinckrodt in the present case cannot rest on what the Supreme Court in Quanta ruled about the issues it said it was addressing or the facts and issues presented for decision. The challenge asserts that any post-sale restriction in a patentee’s own sale fails, as a matter of law, to preserve the patentee’s § 271 rights against unauthorized sales or uses. The argument rests ultimately on language the Court used in Quanta in introducing the exhaustion doctrine before defining the specific issues for decision—as it has done elsewhere.
*739 The Court in Quanta said: “The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.” 553 U.S. at 625, 128 S.Ct. 2109. More recently, the Court used similar “authorized sale” language in introducing the exhaustion doctrine in Bowman v. Monsanto Co., which held that a patentee, by selling patented seeds, does not lose its § 271 right to prevent the buyer, from making new seeds. The Court said: “Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article.” — U.S. —, 133 S.Ct. 1761, 1764, 185 L.Ed.2d 931 (2013). See also, e.g., Univis, 316 U.S. at 249, 62 S.Ct. 1088 (“authorized sale”); Dissent at 774-76.
The challenge to Mallinckrodt asserts that any sale of a patented article by a patentee, even when the rights granted are expressly restricted, is automatically an “authorized sale,” causing the patentee to lose all § 271 rights in the item sold. That consequence follows, the argument goes, no matter how clearly the patentee states an otherwise-lawful restriction on what authority is being conferred and what authority is being withheld. In this view, exhaustion law embodies a sharp distinction between a sale by a patentee (for which restrictions are to b,e disregarded) and a sale made by another person authorized by the patentee to sell, i.e., a licensee as in General Talking Pictures (for which a patentee may preserve its § 271 rights by restricting the licensee’s authorized sales).
That is an extraordinary doctrinal consequence to find established by the Supreme Court’s use of the phrase “authorized sale.” No one suggests that Bowman (concerning new articles) intended such consequences. And there are .good reasons not to find any such implied meaning in Quanta either
1
Most obviously, as discussed above, the Court was not addressing the patentee-sale/licensee-sale distinction. Among other things, the Court did not consider the issues presented by making such a distinction, such as where the line would sensibly be drawn along the spectrum that includes original patentees, assignees, exclusive licensees, and non-exclusive licensees. Such distinctions matter for determining who may bring infringement suits, but they can involve detailed inquiries into the contractual relationships between an original patent owner and others (here, a first seller), based on information a buyer may have no ability or reason’ to acquire. See, e.g., Independent Wireless Telegraph Co. v. Radio Corp. of Am., 269 U.S. 459, 464-69, 46 S.Ct. 166, 70 L.Ed. 357 (1926); Crown Die & Tool, 261 U.S. at 40-41, 43 S.Ct. 254; E.W. Bliss Co. v. United States, 253 U.S. 187, 192, 40 S.Ct. 455, 64 L.Ed. 852 (1920); Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co., 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 423 (1892); Waterman v. Mackenzie, 138 U.S. 252, 255-56, 11 S.Ct. 334, 34 L.Ed. 923 (1891); 8 Chisum § 21.03. Nothing in Quanta suggests that the Court either considered such issues or intended to build such inquiries into the exhaustion doctrine by making the distinction the government now urges.
2
One cannot infer the contrary from the immediate context of the “authorized sale” phrase, i.e., from the several decisions that Quanta briefly describes in the paragraph it introduces with - the “authorized sale” shorthand. 553 U.S. at 625, 128 S.Ct. 2109. Those decisions did not involve restricted patentee sales of patented articles. *740 And the Quanta Court, in describing those cases, said nothing to indicate adoption of a patentee-sale/licensee-sale distinction.
Thus, Bloomer v. McQuewan identifies no sale of a patented article as involved in the case. During an initial patent term, a license granted to the defendants (via Collins and Smith, then Barnet, then Warner and McQuewan) the right to make patented machines and use them “without any limitation as to the time for which they were to be used.” 55 U.S. (14 How.) at 553; id. at 540-41, 548. When the defendants made and used such machines, and the patent term was later extended, the Supreme Court held that the unrestricted right to use did not end when the earlier patent term ended, because the . right to use did not come from the patent statute, which grants only rights to exclude, not rights to practice. Id. at 549-50. The Court discussed purchased articles, but with no restrictions at issue, it did not decide the effect that any restrictions would have. Id.
Bloomer v. Millinger, 68 U.S. (1 Wall.) 340, 17 L.Ed. 581 (1864); is similar in its facts to McQuewan. The Court held that Millinger, who “constructed the machines and put them in operation under the authority of the patentee or his assigns” during a first term extension, was not subject to an infringement action for continued use during a second term extension. Id. at 349, 350. The Court made no distinction between construction and purchase, or between purchases “from the patentee ... or from any other person by him authorized to” make the sale, on the issues addressed. Id. at 350, 351. In referring to a constructor or purchaser of a patented machine having “also acquired the right to use and operate it during the lifetime of the patent,” id. at 350 (emphasis added), the Court implicitly recognized that a purchaser might not acquire a full right to use an acquired article.
And in Adams v. Burke, the Boston regional assignee (Lockhart & Seelye) sold patented coffin lids to Burke, “without condition or restriction.” 84 U.S. (17 Wall.) at 455 (emphasis added). When Burke used the lids outside the Boston territory, for burials within a different territory where Adams was the regional as-signee, Adams sued. The Court held that, for such an unrestricted sale, “there is no restriction on théir use to be implied for the benefit of the patentee or his assignees or licensees.” Id. at 457 (bold italics added).
When the Supreme Court in Quanta moved beyond the Bloomer cases and Adams, it likewise did not advance a patentee-sale/licensee-sale distinction. 553 U.S. at 625-26, 128 S.Ct. 2109. The Court’s next paragraph recounts the developments of the 1910s: The Court initially adopted a broad greater-ineludes-the-lesser approach allowing preservation of patent rights through even otherwise-unlawful restrictions, such as tie-ins, Henry v. A.B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645 (1912); but the Court quickly rejected that broad principle’ and its application to resale price maintenance, Bauer, 229 U.S. 1, 33 S.Ct. 616 (1913), and then to tie-ins, Motion Picture Patents, 243 U.S. 502, 37 S.Ct. 416 (1917), the latter expressly overruling A.B. Dick. The Court in Quanta, summarizing that history, said nothing about the patentee-sale/licensee-sale distinction; and it recognized that the “rule” that emerged, as quoted from Motion Picture Patents, was one based on “ ‘a single, unconditional sale.’ ” 553 U.S. at 626, 128 S.Ct. 2109 (emphasis added).
The Court in Quanta then proceeded to a longer discussion of Univis. That discussion made no patentee-sale/licensee-sale distinction. Rather,.it recounted Univis’s *741 application of exhaustion to sales of articles that may not be strictly covered by the patent but that sufficiently embody the patent. 553 U.S. at 627-28, 128 S.Ct. 2109.
In no part of the Court’s discussion did the Court consider which cases involved “patentee” sales and which “licensee” sales. Indeed, it is not always easy to tell where the facts of each case fall on the spectrum from original patentee through non-exclusive licensee. See, e.g., Bauer, 229 U.S. at 8, 33 S.Ct. 616 (seller was either “agent” or “licensee”). The Court in Quanta did not say that the inquiry mattered. And in Univis, the Court did the opposite of suggesting that the distinction matters: it affirmatively stated that it was treating the patent owner (Univis Corporation) and the licensee-seller (Lens Company) as the same for purposes of its analysis. 316 U.S. at 243, 62 S.Ct. 1088.
3
In these circumstances, it would read too much into the Court’s use of the phrase “authorized sale” to draw the government’s conclusion—making the sharp patentee-sale/lieensee-sale distinction— without full analysis of statutory, prece-dential, and other considerations. Full analysis of the relevant legal context is necessary.
Such analysis would be required regardless, but it is important to note that the phrase “authorized sale” does not, by its words alone, compel the government’s conclusion. It has long been a familiar feature of our legal landscape that property rights in a particular thing—like the separate interests in making, selling, using, etc., an invention—are viewed as a “bundle” of rights (or sticks) that can generally be transferred, separately.[7] ; Of course, particular legal regimes, for various purposes, commonly identify the transfer of particular rights as determinative of a “sale.” In determining which transfers are decisive, context matters. And here the context is a statute that identifies separate rights of manufacture, sale, use, etc., and the precedential setting is one' that expressly recognizes the possibility of separating the rights in a patented article. See, e.g., Mitchell, 83 U.S. (16 Wall.) at 547 (exhaustion exists when a patentee “has himself constructed a machine and sold it without any conditions, or authorized another to construct, sell, and deliver it, or to construct and use and operate it, without any conditions'“the owner of the machine, whether he built it or purchased it, if he has also acquired the right to use and operate it during the lifetime of the patent, may continue to use it”) (emphases added); Bloomer v. Millinger, 68 U.S. (1 Wall.) at 350. Moreover, the statutory purpose of the inquiry here is to idéntify what sales confer “authority” on the buyer to engage in distinct,- otherwise-infringing acts.
*742 Context is particularly important where, as here, .the phrase being interpret ed comes from judicial opinions not directly deciding the point at issue. Chief Justice Marshall wrote for the Court almost 200 years ago: “It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.” Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400, 5 L.Ed. 257 (1821); see Armour & Co. v. Wantock, 323 U.S. 126, 132-33, 65 S.Ct. 165, 89 L.Ed. 118 (1944) (per Jackson, J.) (“[Wjords of our opinions aré to be read in the light of the facts of the case under discussion____ General expressions transposed to other facts are often misleading.”).[8] We bear that maxim in mind in applying the body of Supreme Court case law on exhaustion: that body of precedent contains no decision against a patentee’s infringement assertion in the present circumstances, and the decisions on related circumstances require careful reading to determine the best understanding of what issues the Court actually decided.
D
We conclude that a patentee may preserve its §. .271 rights when itself selling a patented article, through clearly communicated, otherwise-lawful restrictions, as it may do when contracting put the manufacturing and sale.
1
That conclusion follows naturally from the statute.' Congress straightforwardly prescribed, in § 271(a), that a sale or use of a patented article “without authority” is an infringement. Under that language, .a clear denial of authority leaves a buyer without the denied authority.
The exhaustion rule for imrestrict-ed sales readily fits the language of § 271(a). It is reasonable for the courts to treat a patentee-made or patentee-author-ized sale of a patented article (without distinction) as presumptively granting “authority” to the purchaser to use it and resell it. Such an approach recognizes the utility of having a default rule for determining whether authority has been conferred in the many circumstances where an express conferral is missing. And it chooses as the default a principle that sensibly accords with parties’ likely expectations as to a domestic sale.
But it is quite a different matter to treat a sale as conferring on the buyer the very authority that is being denied through clearly communicated restrictions. Mallinckrodt sensibly rejects that counter-textual result. Unless granting “authority” is to be a legal fiction, a patentee does not grant authority by denying it. And that is so for patentee sales and licensee sales alike, i.e., whether the patentee denies the authority to its direct purchaser or to one purchasing through a manufacturing lieen- *743 see. For the same reason, the result: does not reasonably reflect market participants’ expectations: a buyer cannot reasonably expect that the seller is conferring authority that the seller is expressly denying, whether the seller is the patentee or a manufacturing licensee. The statutory question of authority neither allows denials to be grants nor logically depends on whether there is an intermediary between, the patentee and the first buyer.
In short, the government’s position would create a rule of court-made law that runs counter to, rather than accords with, the statutory definition of actionable infringement. An exhaustion rule should fit rather than contradict the statutory text.
2.
Under longstanding Supreme . Court precedent, a patentee may preserve its patent rights against downstream buyers by arranging with someone else, even a nonexclusive licensee,- to make and sell patented articles, under clearly stated restrictions on post-sale activities. There is no good reason that a patentee that makes and sells the articles itself should be denied the ability that is guaranteed to a non-practicing-entity patentee. No precedent requires a contrary conclusion.
a. The Supreme Court has recognized that a patentee may preserve its rights against infringement by establishing restrictions accompanying the- sale of the patented article (communicated at the-time of sale), including restrictions on the, buyer’s post-acquisition use. That recognition is implicit in the Motion Picture Patents statement of the exhaustion rule as based on an “unconditional” sale, as quoted in Quanta, 553 U.S. at 626, 128 S.Ct. 2109. More affirmatively, the Court upheld a claim .of infringement on that basis in Mitchell v. Hawley, where the licensee seller was. under a restriction as to the (temporal) scope of rights it could and did convey when selling the patented machine. Mitchell involved a licensee seller, but the Court stated the exhaustion principles in terms keyed to the absence of conditions and applicable to patentee sales:
[W]hen [the patentee] has himself constructed a machine and sold it without any conditions, or authorized another to construct, sell, and deliver it, or to construct and use and operate it, without any conditions, and the consideration has been paid to him for the thing patented, the rule is well established that the patentee must be understood to have parted to that extent with all his exclusive right, and that he ceases to have any interest whatever in the patented machine so sold and delivered or authorized to be constructed and operated.
83 U.S. (16 Wall.) at 547; see id. at 548 (sales “may be made by the patentee with or without conditions, as in other cases, but where the sale is absolute, and without any conditions, the rule is well settled that the purchaser may continue to use the implement or machine purchased until it is worn out”).[9] Although Mitchell involved a licensee sale, its language did not distinguish licensees’ sales from patentees’ sales in the respects discussed, and it was not long before the Court invoked those for- *744 mutations in a patentee-sale case. Keeler, 157 U.S. at 662-63, 15 S.Ct. 738.
Most importantly, the Court squarely held in the General Talking Pictures case that a patentee could preserve its infringement rights against unauthorized uses by restricting manufacturing licensees’ authority to sell for such uses. General Talking Pictures Corp. v. Western Elec. Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, opinion on rehearing at 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938). Companies holding patent rights in certain amplifiers (AT & T, Western Electric, RCA) licensed the American Transformer Company to make and sell amplifiers. The Transformer Company “was a mere licensee under a nonexclusive license, amounting to no more than ‘a mere waiver of the right to sue.’ ” 304 U.S. at 181, 58 S.Ct. 849 (quoting De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927)). The license permitted sales only “for radio amatéur reeéption, radio experimental reception, and home broadcast reception,” not “for use in theaters as a part of talking picture equipment.” Id. at 180, 58 S.Ct. 849. The Transformer Company nevertheless sold amplifiers to General Talking Pictures for theater use in violation of the restriction, and General Tálking Pictures “had actual knowledge that [the Transformer Company] had no license to make such a sale.” Id. When the patentees sued General Talking Pictures (the'buyer) for infringement, the Supreme Court, based on Mitchell, affirmed the judgment of infringement. Id. at 181-82, 58 S.Ct. 849.
The Court came to the same conclusion when it reconsidered the question on rehearing. It said: “Any use beyond the valid terms of a license is, of course, an infringement of a patent.” 305 U.S. at 126, 59 S.Ct. 116. Moreover, “[t]hat a restrictive license is legal seems clear.” Id. at 127, 59 S.Ct. 116 (citing Mitchell). The use restriction was a lawful one, the Court observed, and “[a]s the restriction was legal and the amplifiers were made and sold outside the scope of the license, the effect is precisely the same as if no license whatsoever had been granted to Transformer Company.” Id. General Talking Pictures, knowing of the restriction, was “liable because it ha[d] used the invention without license to do so.” Id. Thus, General Talking Pictures was held to be liable for patent infringement. It was not held liable for breach of contract; indeed, it had no contractual relationship with the patentees.
b. The Supreme Court thus held that a patentee can preserve its patent rights by authorizing a manufacturing licensee to make and sell a patented article under an otherwise-proper restriction, including a restriction on the buyer’s post-purchase use. When the buyer, knowing of the restriction at the time of purchase, subsequently uses the article in violation of the restriction, the buyer is infringing.
To distinguish the present patentee-sale situation, the government must contend that a patentee cannot preserve its patent rights against uses of a patented article contrary to known use restrictions if, instead of licensing someone else to make and sell the article, it chooses to make and sell the article itself. That contention would draw a sharp line between practicing-entity patentees (those Who themselves make and sell the articles at issue) and non-practicing-entity patentees (those who do not). Non-practicing-entities would have greater power to maintain their patent rights than practicing entities.
The government points to no basis in the policy of the patent statute for making that distinction. Nothing in the patent statute suggests • that patentees should have to *745 contract out their manufacture and sale of patented articles to preserve their § 271 rights. The essential tradeoff of the patent system—to provide a market-based reward in exchange for disclosure—is equally applicable whether the patentee sells or licenses another to make and sell. The Federal Trade. Commission made the fundamental point as follows: “A patentee can obtain a financial reward for its patent by producing a product that incorporates the invention or by transferring the technology through a patent license or sale to a manufacturer who develops and produces a product. The market reward earned by the patentee in either case will depend upon the extent to which consumers prefer the patented. invention over alternatives and prior technology, which helps determine the invention’s economic value.” See Fed. Trade Comm’n, The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition 139 (2011) (footnote attached to “market reward” states: “The ‘market reward’ defined here is the amount the patentee could have earned by either selling a patented product or licensing the patented technology in the absence of infringement.”)! The distinction urged on us appears to be unjustifiably formalistic, not founded in relevant economic substance. Mallinckrodt, 976 F.2d at 705.
The proposed distinction would also introduce practical problems. Where would the line be drawn along the spectrum from original patentees to assignees (e.g., regional assignees) to exclusive licensees (exclusivity being possible as to some but not all of the § 154 rights) to nonexclusive licensees? As we already have noted, patent law makes those distinctions for purposes of identifying who may bring infringement actions, but the distinctions are sometimes difficult to pin down and dependent on detailed inquiries into contractual provisions. When purchasing a patented article from a particular seller under specified restrictions that are not independently improper, how is the buyer to know where the seller falls along- the spectrum—and, hence, whether the buyer may ignore the restrictions without fear of patent infringement?
c. The government advances a doctrinal defense of the patentee-sale/licensee-sale distinction on which it rests its challenge to Mallinckrodt. The government begins its argument on the Mallinckrodt issue by first noting the absence of statutory text supporting its position and then turning, .in the next sentence, to a passage from Bloomer v, McQjietvan to supply a foundation for its argument. U.S. Br. 5. It asserts that “[tjhis distinction stems from the fact that licensees exercise a portion of the patentee’s rights.” Id. at 8 (citing Bloomer v. McQuewan, 55 U.S. (14 How.) at 549-50). .But that key distinction is wrong as a matter of basic patent law, misreads Bloomer v. McQuewan, and cannot distinguish General Talking Pictures from this case. A mere nonexclusive licensee, as in General Talking Pictures, possesses no portion of the rights granted by Congress in the patent.
Patent rights are only .rights to exclude, not rights to practice.- See 5 Chisum § 16.02[1]. Among the- “clearly established principles’! of patent law, as.the Supreme Court described them in Crown Die & Tool Co., are that “the government did not confer on the patentee the right himself to make, use or vend his own invention” and “in its essence all that the government conferred by the patent was the right to exclude-others from making, using or vending his invention.” 261 U.S. at 35, 43 S.Ct. 254; see Bauer, 229 U.S. at 10, 33 S.Ct. 616 (“The right to make, use, and sell an invented article ,is not derived from the patent law.... The [patent stat *746 ute], secured to the inventor the exclusive right to make, use, and vend the thing patented, and consequently to prevent others from exercising like privileges without the consent of the patentee.”); Continental Paper Bag, 210 U.S. at 425, 28 S.Ct. 748; Bloomer v. McQuewan, 55 U.S. (14 How.) at 549 (“The franchise which the patent grants, Consists altogether in the right' to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent.”); Western Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir.1930); see also Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 215, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980) (“long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention”). It is for that reason, for example, that a patentee may be prevented from practicing its own patent by another’s patent. See Cantrell, 117 U.S. at 694, 6 S.Ct. 970; Blake, 94 U.S. at 733; Smith, 88 U.S. (21 Wall.) at 118-19.
 A patentee exercises its congressionally granted rights only when it invokes its power. to exclude others, not when it sells its product. Similarly, the congressionally granted right to exclude may be viewed as being shared by certain exclusive¡ -licensees, who, in appropriate circumstances (e.g., with joinder of the patent owner), may bring infringement actions against others to enforce exclusivity. See Independent Wireless, 269 U.S. at 464-69, 46 S.Ct. 166 (discussing cases); 8 Chisum § 21.03[2]. But an exclusive licensee, in merely selling (or making, using, etc;) a patented article, is not exercising any power conferred by the patent statute. That is a. fortiori true of a non-exclusive licensee, like the licensee in General Talking Pictures, which has no exclusivity protections at all. Thus, although the government’s assertion that “licensees stand in patentees’ shoes” in' sharing certain patent-granted rights is true in a significant respect as to exclusive licensees, U.S. Br. 8, it is not true as to non-exclusive licensees—like the licensee in General Talking Pictures. Accordingly, a patentee’s ability to preserve its patent rights (rights to exclude) by arranging for sales to be made by a non-exclusive licensee, like the Transformer Company, cannot rest oh a premise that “licensees exercise a portion of the patentee’s rights.” U.S. Br. 8.
Bloomer v. McQuewan, on which the government relies from the outset of its argument, U.S. Br. 5, does not say otherwise. The government states that in Bloomer v. McQuewan “the Court explained that a purchaser of a patented article ‘stands on different ground’ than one who obtains a license under the patent,” because the latter “ ‘obtains a share in the monopoly ... derived from, and exercised under’ the patent.” Id. (emphasis added) (quoting Bloomer v. McQuewan, 55 U.S. (14 How.) at 549). But the. Court did not say that about simply “one, who obtains a license,” like the licensee.in General Talking Pictures.
What the Court said in Bloomer v. McQuewan—immediately after the sentences stating that the patent gives the patentee only “the right to exclude”—is that “when [the patentee] sells the exclusive privilege of making or vending [the invention] for use in a particular place,” the privilege ends with the patent that creates it. 55 U.S. (14 How.) at 549 (emphasis added). That statement is about the exclusivity right, i.e., the right to exclude others, which an assignee or exclusive licensee obtains in whole or in part. By its terms, and consistent with the just-stated definition of the limited nature of the patent franchise, it says nothing about a non-exclusive licensee obtaining a share *747 in the monopoly. The Court then contrasted, as “stand[ing] on different ground,” one who simply buys a patented device, which “[t]he inventor might lawfully sell to him, whether he had a patent or not, if no other patentee stood in his way.” Id. The buyer, as mere owner and user of the device, lacks any patent-granted right to exclude, i.e. “exercises no rights created. by the act of Congress,” so whatever rights it has do not end with the patent’s expiration. Id. The distinction was not between a sale from a patentee and a sale from a bare (non-exclusive) licensee. In short, General Talking Pictures cannot be distinguished on the doctrinal basis the government invokes.
d. No Supreme Court decision compels adoption of the distinction the government urges. As Impression noted at oral argument, it is undisputed that no Supreme Court decision has involved a 'single-use/ no-resale restriction on a patentee’s sale and found the restriction insufficient to preserve the patentee’s infringement rights against a buyer engaging in the forbidden reuse or resale. More generally, no Supreme Court precedent denies a patentee.the ability to preserve its § 271 rights, by a clear communication of an otherwise-permissible restriction, when it sells the patented article itself, just as the patentee may do, under the General Talking Pictures principle, when contracting out the making and selling of the patented article.
We have already noted the limitations on what, was presented and decided in the Bloomer cases (rejecting implied temporal use restrictions) and Adams (rejecting implied geographic use restrictions). In 1881, the Supreme Court summarized the relevant law: “The right of the owner of a patented machine, without any conditions attached to his oumership, to continue the use of his machine during; an extended term of the patent, is well settled.” In re Paper-Bag Cases, 105 U.S. at 770-71 (emphasis added) (citing Bloomer v. McQuewan, Mitchell, Adams, and Chaffee v. Boston Belting Co., 63 U.S. (22 How.) 217, 16 L.Ed. 240 (1859)). In so stating the law, in terms that tied exhaustion to the absence of conditions, the Paper-Bag Cases Court cited at least one case, Adams, involving a sale made by an assignee (a patentee under patent law).[10]
The Court in Hobbie v. Jennison, 149 U.S. 355, 13 S.Ct. 879, 37 L.Ed. 766 (1893), described and followed the holding of Adams that, when an assignee sold machines, “there was no restriction on their use to .be implied, for, the benefit of the patentee or his assignees or licensees.” 149 U.S. at 362, 13 S.Ct. 879 (emphasis added). The Court held that an unrestricted sale of pipe in Michigan by the Michigan assignee (Jennison’s firm), with full rights to sell it, allowed the buyer , to use it in Connecticut free of the patent rights belonging to the Connecticut assignee (Hobbie).
In its 1895 decision in Keeler, the Court applied its existing precedents, especially Adams and Hobbie. The Massachusetts assignee (Standard Folding-Bed) sued Keeler when he bought patented beds from the Michigan assignee, subject to no restrictions, and brought them to Massachusetts for sale. 157 U.S. at 660,15 S.Ct. 738 (stating facts - before opinion starts). The Court noted that in Adams the patented articles “were sold to [Burke] without condition or restriction,” id. at 663, 15 *748 S.Ct. 738, and it concluded that Adams “was applicable,” id. at 665, 15 S.Ct. 738. The Court also quoted as defining the law (in this patentee-sale case) the passage set out above from Mitchell (a licensee-sale case). Id. at 663, 15 S.Ct. 738. In any event, with no restriction on the sale present, the Court followed Adams’ refusal to find one implied by the patent law.
It was against that background that the Court' then notecl: “Whether á patentee may protect himself and his assignees by special contracts brought home to the purchasers is' not a question before us,” but “such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws.” Id. at 666, 15 S.Ct. 738 (emphasis added). That language lends itself to use in the government’s argument that sale restrictions never preserve patent rights, but give only contract rights. But even in Keeler the language does not compel that reading, and the later decisional law—most importantly, General Talking Pictures— undermines the contract-only interpretation.
Thus, in Keeler itself, the word “inherent” naturally ties the language to the modest point based on Adams that actually decided Keeler: with no contract restriction as part of the sale, an implied one cannot be found in patent law itself. That says nothing about the irrelevance of an actual contract restriction to preservation of patent rights. Moreover, in the licensee-sale context, General Talking Pictures establishes that contract restrictions can indeed preserve a patentee’s infringement rights and aré not merely enforceable under contract law: General Talking Pictures, which had no contract with the patentees, was held liable for patent infringement, not breach of any contract with the patentees. Notably, then, in Quanta, a licensee-sale case like General Talking Pictures, the Court quoted the language from Keeler after discussing General Talking Pictures (without a hint of disapproval) and concluding that, as in Keeler, Adams, and Hobbie, there simply was no patentee-imposed contractual restriction applicable to the sales at issue. 553 U.S. at 637 n. 7, 128 S.Ct. 2109. And in the present case, as in General Talking Pictures, there is no reason to think that the patentee has a contract remedy available as a substitute for patent infringement: as far as the record before us shows, Lexmark has no contractual relationship with Impression.
In United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), the Supreme Court rejected the government’s antitrust challenge to (among other things) General Electric’s licensing of Westinghouse to make and sell patented lamps under terms controlling resale prices. See Fed. Trade Comm’n v. Actavis, Inc., — U.S. —, —, 133 S.Ct. 2223, 2232, 186 L.Ed.2d 343 (2013) (describing General Electric). In making a general point about patentee sales (not involved in the- case), the Court said: “It is well settled, as already said, that where a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee’s rights.” 272 U.S. at 489, 47 S.Ct. 192 (citing cases). We read that language to deem “settled” only what was. settled in the cited precedents—a patentee’s sales without restrictions exhaust patent rights in the item sold. The cited cases are Adams, Bloomer v. McQuewan, Hobbie, Keeler, and Mitchell. They do not go beyond that proposition.
The prominent exhaustion decisions from the 1910s do not make the patentee-sale/licensee-sale distinction urged by the *749 government here. After A.B. Dick adopted a broad principle that preserved a paten-tee’s patent-law rights against restriction-violating sale, use, etc., even if the restrictions were otherwise unlawful—in A.B. Dick, a tie-in requiring purchase of unpatented products—the Supreme Court repudiated A.B. Dick’s broad principle and held particular restrictions improper and therefore not effective at preserving patent rights against actions contrary to those .restrictions. It did so as to tie-ins in Motion Picture Patents, overruling A.B. Dick and relying on the 1914 Clayton Act, 38 Stat. 730. See 243 U.S. at 517, 37 S.Ct. 416. And it did so as to resale price maintenance in Bauer, Straus, and finally Boston Store, relying on the judicially adopted per se antitrust condemnation of that practice in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), overruled by Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). See Bauer, 229 U.S. at 12, 33 S.Ct. 616; Straus, 243 U.S. at 498, 37 S.Ct. 412; Boston Store, 246 U.S. at 21, 38 S.Ct. 257. But the Court did not rule that all restrictions on a pat-entee’s sale were ineffective to preserve the patentee’s patent-law rights'. Instead, it called for an inquiry—in accord with what Mallinckrodt later said—into whether a patentee’s restrictions were otherwise improper, as by “extend[ing] the scope of its patent monopoly.” Motion Picture Patents, 243 U.S. at 516, 37 S.Ct. 416. And the Court did not adopt the line the government suggests between patentee sales and licensee sales.
In its 1942 decision in Univis, the Supreme Court rejected a patent-based defense to the government’s antitrust challenge to resale-price-maintenance restrictions in the licensing and selling of eyeglass lenses. The Court said that it had two questions before it: first, whether the restrictions were “excluded by the patent monopoly from the operation of the Sherman Act,” i.e., whether if the restrictions were illegal under the Sherman Act, they were saved by the patent law; and second, whether the restrictions were illegal under the Sherman Act. 316 U.S. at 243, 62 S.Ct. 1088. The Court said no on the first question, id. at 249-52, 62 S.Ct. 1088, and yes on the second, id. at 252-54, 62 S.Ct. 1088.
The second answer (regarding the substance of antitrust law) is immaterial here, and the first answer is in accord with Mallinckrodt’s ruling—-which expressly recognizes that, as Univis held, restrictions that are otherwise unlawful do not preserve patent rights. Moreover, although some language in Univis, like language in other decisions in the area, can be taken out of context and read as going beyond the specific restrictions involved, id. at 249-51, 62 S.Ct. 1088, the most the Court ruled, even as to patent law all by itself, was that a vertical price-control restriction was ineffective to preserve patent rights after sales of articles embodying the patents. While Univis is controlling on whát it decided pn the issues before it, we do not think- it appropriate to give broad effect to language in Univis, taken out of context, to support an otherwise-unjustified conclusion here on a question not faced ..there. And that is particularly so today, given that the Univis opinion relied in part on strongly restrictive patent-misuse decisions that were repudiated by Congress after Univis was decided.[11]
*750 Most pointedly for present purposes, Univis does not support the distinction between patentee sales and licensee sales the government urges in this case. The Univis ease was decided just four years after General Talking Pictures, which confirmed that a patentee may preserve its patent rights by imposing otherwise-lawful restrictions on sales by its manufacturing licensees. -Yet Univis says nothing to limit that prominent, recent ruling.' Moreover, as we have already noted, Univis is explicit that it made no difference to the Court’s analysis whether the patentee (Univis Corporation) or the manufacturing licensee (Univis Lens Company) was doing the selling: the Court stated that the two companies “may for the purposes of this suit be treated as though they were a single corporation.” 316 U.S. at 243, 62 S.Ct. 1088... The Court also stated its point about the particular sale as equally applicable to a “[s]ale of a lens blank by the patentee or by his licensee.” Id. at 249, 62 S.Ct. 1088 (emphasia added).[12]
For the foregoing reasons, we think that the best lesson to draw from the Supreme Court’s precedents, as applied to the question before us, is that a patentee may preserve its patent rights by otherwise-proper restrictions when it makes and sells patented articles itself and not only when it contracts out manufacturing and sales.
3
We see ho basis for a different conclusion in Lord Coke’s description in 1628 of a British common-law principle, as quoted in Kirtsaeng, 133 S.Ct. at 1363. Lord Coke described what British courts, in the absence of an overriding legislative prescription, would treat as an impermissible anti-alienation restriction on a seller’s disposition of “ ‘his whole interest’ ” in a chattel. Id. Lord Coke’s formulation was part of the judicial formulation of background law for personal property generally, and it neither addressed possible differences among particular kinds of personal property nor suggested' that a judicial rule would override specific legislative grants. Lord Coke’s formulation was a pertinent reference point in Kirtsaeng, because, as we have rioted, the copyright statute, 17 U.S.C. § 109(a), states a’ rule that itself over-rides the otherwise-applicable statutory bars on infringement and importation arid grants of exclusive rights. In stating 'one common-law jurisdiction’s general judicial policy at one time toward anti-alienation restrictions, Lord Coke’s description confirmed that the otherwise-supported reading of § 109(a) fit a legal tradition.
Lord Coke’s quote does not purport to .address the effect of a legislative prescription of broad rights to control sale and use.[13] That is what is present in the Pat *751 ent Act, but . not the copyright law. Sections 154(a) and' 271(a) legislatively establish a patentee’s rights over sale and use, without subservience to a superseding grant of rights to one who owns a particular article. They grant those rights separately as to making, selling, using, etc., thus recognizing different sticks in the bundle of rights; they grant, them without an exception keyed to the patentee’s prior ownership of a particular article embodying the invention; and they grant them unless, as relevant here, the patentee confers “authority.” Lord Coke’s quote does not address the. Patent Act situation or suggest that federal courts may treat a denial of authority as a conferral of authority.
Different policy choices can readily be made and justified in this area, even as to background rules applicable to personal property generally. Some of the. numerous, distinct common-law jurisdictions, including Lord Coke’s, have departed at various times from the background rule expressed by Lord Coke. See De Mottos v. Gibson, (1859) 45 Eng. Rep. 108 (Ch. App.); Waring v. WDAS Broad. Station, Inc., 327 Pa. 433, 194 A. 631, 637-38 (1937); Metro. Opera Ass’n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, 494-95 (N.Y.Sup.Ct.1950), aff’d, 279 A.D. 632, 107 N.Y.S.2d 795 (N.Y.App.Div.1951); Pratte v. Balatsos, 99 N.H. 430, 113 A.2d 492, 494-95 (1955); Nadell & Co. v. Grasso, 175 Cal.App.2d 420, 346 P.2d 505, 509-10 (1959); Clairol Inc. v. Cosmetics Plus, 130 N.J.Super. 81, 325 A.2d 505, 508 (N.J.Sup.Ct.1974); Zechariah Chafee, Jr., Equitable Servitudes on Chattels, 41 Harv. L.Rev. 945, 1007-13 (1928); Zechariah Chafee, Jr., The Music Goes Round and Round: Equitable Servi-tudes and Chattels, 69 Harv. L.Rev. 1250, 1254-56 (1956); Glen O. Robinson, Personal Property Servitudes, 71 U. Chi. L.Rev. 1449, 1455-60 (2004). In 1918, then-Dean Harlan Fiske Stone wrote: “The tendency in the United States has been to apply the doctrine of restrictive agreements to personal property when not regarded as an unlawful restraint of trade or in violation of public policy.” The Equitable Rights and Liabilities of Strangers to a Contract, 18 Colum. L.Rev. 291, 310 (1918).
In any event, and more specifically, whatever considerations might'-go into a jurisdiction’s choice as to the background rule for personal property in general, lawmaking authorities may reasonably make different choices for particular kinds of property. Notably, as to intellectual property in its various forms, .Congress, implementing the Constitution, has long deemed it important to incentivize creation and disclosure through grants to the creator of rights to exclude others for a time, the duration and scope based on features of the particular kind of intellectual property (e.g., patent terms are much shorter than copyright terms). The Patent Act expressly .does so regarding patent rights, specifically giving separate rights to exclude others from making, using, selling, etc. That overriding legislative prescription removes the patented-article sale from the scope of Lord Coke’s 1628 description of his country’s general judicially fashioned property law, as British tribunals, recognized long ago. See A.B. Dick, 224 U.S. at 42-43, 32 S.Ct. 364 (quoting the judicial committee of the Privy Council, speaking through Lord Shaw in 1911: “the general doctrine of absolute freedom of disposal of chattels of an ordinary kind is, in the case *752 of patented chattels, subject to the restriction that the person purchasing them, and in the knowledge of the conditions attached by the patentee, which knowledge is clearly brought home to himself at the time of sale, shall be bound by that knowledge and accept the situation of ownership subject to the limitations. These limitations are merely the respect paid and the effect given to those conditions of transfer of the patented article which the law, laid down by statute, gave the original patentee a power to impose.”) (quoting Nat’l Phonograph Co. v. Menck, [[1911] A.C. 336, 349 (P.C.1911 appeal taken from Aus.)]); Incandescent Gas Co. v. Cantelo, [1895] 12 R.P.C. 262, 264 (Eng.).
In short, notwithstanding Lord Coke’s description of English general personal-property judge-made law, the patent-specific statutory analysis must govern here.
4
Finally, following the analytical method of Kirtsaeng, we consider what we can reliably gauge about the likely real-world consequences of one answer or another to the exhaustion question presented here. As indicated at the front of this opinion, we have received numerous amicus briefs making competing arguments, with varying degrees of reliable factual support, for the effect of Mallmckrodt on their interests or the interests they promote. We cannot assess those contentions and make policy choices in the way Congress can. We can say only that the amicus presentations give us no reason to depart from the application of § 271 we derive from the statute and precedent.
In particular, we see no basis for predicting the, extreme, lop-sided impacts the Court found plausible in Kirtsaeng in different circumstances. Mallinckrodt has been the governing case law since 1992 and has been reiterated in subsequent precedent. And -yet we have been given no reliable demonstration of widespread problems not being solved in the marketplace. Given General Talking Pictures, the only question is about patentees’ ability to do for their own sales what- they already can do by contracting out their manufacturing and sales. Regarding the specific scenario- we are addressing today—in which the patentee has sought to preserve its-patent rights by conditioning its first sale on a single-use/no-resale restriction of which the accused infringer had adequate notice at the time of purchase—we have been given no proof of a significant problem with enforcing patent rights.
At the same time, the conduct challenged here can have benefits. Lexmark’s Return Program provides customers an immediate up-frorit benefit: a choice between two options, one offering them a lower price in exchange for the single-use/no-resale limitation. And a company in Lexmark’s position could have a plausible legitimate interest in not having strangers modify its products and introduce them into the market with the quality of modifications (including ink refills) not subject to Lexmark’s control: lower quality of remanufactured cartridges could harm Lexmark’s reputation. See Chafee, 41 Harv. L.Rev. at 946-47. A medical supplier in Mallinekrodt’s position plausibly may have similar reason to believe that reuse, when not under its own control, carries a significant risk of poor or even medically harmful performance, to the detriment of its customers and its own reputation. Such interests are hardly unrelated to the interests protected by the patent law—the interests both of those who benefit from inventions and of those who make risky investments to arrive at and commercialize inventions. See Robinson, 71 U. Chi. L.Rev. at 1480-1515 (surveying rea *753 sons for restrictions, particularly in intellectual-property area).
We do not have a record on such interests in this case, as Impression has not claimed that the restrictions at issue.violate antitrust, patent-misuse, or similar constraints. And it is not our function to assess the strength of such interests against those which might pull the other way. Nor can we fairly assume the illegitimacy of the conduct here. Such an assumption would run counter to the large-scale changes in antitrust law and patent-misuse law, • especially over the last four decades, that have displaced the strict condemnation" of various vertical restrictions that characterized both areas of law in the first half of the twentieth century.
Thus, the Supreme Court broadly held that non-price vertical restraints are to be judged by a rule of reason. See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 57-59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), overruling United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The Court abandoned its “strong disapproval of tying arrangements” by insisting on market power in the tying product as a precondition to condemnation. See Illinois Tool Works Inc. v. Independent Ink, Inc., 547 U.S. 28, 35-38, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006); Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). It overturned both the per se ban on vertical agreements setting maxinium resale prices, State Oil Co. v. Khan, 522 U.S. 3, 7, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), overruling Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and the per se ban on vertical agreements setting minimum resale prices, Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 900-01, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007), overruling Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).
' The absence of a general basis for finding market harm from vertical restrictions is recognized specifically in the" patent area, tod. Field-of-use restrictions in patent licenses have long been common, as Mallinckrodt points out and General Talking Pictures shows, In 1988, building on an initial relaxation of patent-misuse standards in 1952, Congress made clear that tying arrangements involving a non-patented product do not constitute patent misuse where the patentee lacks market power. 35 U.S.C. § 271(d)(5). The Supreme Court, citing that determination, subsequently overturned its own- longstanding antitrust presumption that patent (and copyright) owners have market power. Illinois Tool Works, 547 U.S. at 41-42, 126 S.Ct. 1281. And the two federal antitrust agencies have recognized that restrictions in intellectual-property licenses can be procompetitive.' See U.S. Dep’t of Justice & Fed. Trade Comm’n, Antitrust Guidelines for the Licensing of Intellectual Property § 2.3 (1995) (“Field-of-use, territorial, and other limitations on intellectual property licenses may serve procompeti-tive ends by allowing the licensor to exploit its property as efficiently and effectively as possible.”).
For those reasons, we see no basis for departing from the legal analysis set out above. A patentee already may preserve its patent rights against downstream buyers (with notice) through otherwise-lawful restrictions, by licensing others to make and sell its patented articles. We conclude that the law does not forbid the patentee to do the same when making and selling the articles itself.
III
The second question presented-to us is whether Lexmark’s sales of its cartridges *754 abroad conferred authority on its buyers, and derivatively on Impression, to import the cartridges into, and sell and use them in, the United States, which would be infringing acts in the absence of authorization. The question was’ decided by the district court, and is presented here, on the premise that Lexmark made the foreign sales without communicating a reservation of U.S. patent rights. And the question is presented only as an exhaustion question, because Impression did not press any implied-license defense, despite the fact that Quanta made clear that the doctrines are distinct.
. The absence of an implied-license defense in this case sharpens the definition of the issue presented. ..There is no doubt that a U.S. patentee, when selling a U.S.patented article .abroad, could give the buyer permission, expressly or by implication from the circumstances, to import the purchased article into the United States and sell and use it here. Such a license would make those acts non-infringing. The question for decision is whether, if there is no proof of any such license (express or implied), there is nonetheless, a legal rule that such a foreign sale confers authority on the overseas buyer to import the patented article-into the United States and sell and use it here. If there is such a legal rule of authorization, the next question is whether the authorization is conclusive, effective even in the face of the U.S. patentee’s reservation of U.S. rights, or only presumptive, with: the U.S. patentee able to reserve its U.S. rights if it can demonstrate with adequate certainty that it has. taken the steps needed, to. do so.
We conclude, as we did in Jazz Photo, that there is no legal rule that U.S. rights are waived, either conclusively or presumptively, simply by virtue of a foreign sale, either made or authorized by a U.S. patentee. The government, we note, agrees that a conclusive-exhaustion rule should be rejected but argues for a presumptive-exhaustion rule regarding a U.S. patentee’s foreign sales. In the government’s view, a U.S. patentee can reserve its U.S. rights when selling abroad (but not if selling domestically, under the government’s view that Mallinckrodt is wrong). We conclude that neither a conclusive- nor a presumptive-exhaustion rule is legally justified.
A
This court’s 2001 decision in Jazz Photo reviewed the International Trade Commission’s finding that Jazz Photo (and others) infringed, patents of Fuji Photo Film by importing refurbished disposable cameras originally sold by or with the authorization of Fuji Photo. 264 F.3d 1094, 1098. Two groups of cameras sold by or with the authorization of Fuji Photo were at issue: those sold initially in the United States, refurbished abroad, and imported back into the United States; and those initially sold abroad, refurbished abroad, and imported into the United States. This court drew different conclusions about infringement regarding those two groups of imported cameras.
Disagreeing with the Commission on the central issue in the ease, the- court held that a specifically described set of refurbishment changes (involving insertion of new film into the used casings) were mere repairs, not reconstructions that amounted to creation of new articles. Id. at 1102-07. Therefore, the court ruled, for the “used cameras whose first sale was in the United States with the. patentee’s authorization,” and that were subjected to only those changes (with disclosure to the Commission), Jazz Photo’s importations were not infringing: repair maintained the identity of the article initially sold, and the domestic sale exhausted the patentee’s rights in *755 the article.sold (but not in néwly created articles). Id. at 1098-99, 1102-05 (discussing, for example, Aro I, 365 U.S. at 346, 81 S.Ct. 599); see Bowman, 133 S.Ct. at 1766. As to those used cameras, the court reversed the Commission. 264 F.3d at 1099.
The court held, however, that a different result was required for any of the imported cameras that previously had been “sold only overseas,” even if the changes in them amounted only to repair. Id. at 1105 (emphasis added). Relying on Boesch v. Graff, 133 U.S. 697, 701-03, 10 S.Ct. 378, 33 L.Ed. 787 (1890), the court ruled that “United States patent-rights are not exhausted by products- of foreign provenance,” i.e., products previously sold- only abroad. 264 F.3d at 1105. Thus,. the court’s non-infringemént ruling (and reversal of the Commission) applied only to used cameras “for which the United States patent right has been exhausted by first sale in the United States” and whose refurbishing was limited as described. Id. The imported cameras not previously sold in the United States, in contrast, “are not immunized from infringement of United States patents by the. nature of their refurbishment.” Id. There is no suggestion that Jazz Photo argued that Fuji Photo had expressly or impliedly licensed importation in making or authorizing the foreign sales, and the court said nothing to foreclose such a defense to infringement. Accordingly, as to cameras “whose prior sale was not in the.United States,” the court affirmed the Commission’s, infringement finding and remedies against Jazz Photo. Id. at 1111.
The court followed Jazz Photo in Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., 394 F.3d 1368, 1370 (Fed.Cir.2005), which affirmed a district court’s judgment of infringement by Jazz Photo (and others) in favor of Fuji Photo in litigation involving the same dispute as Jazz Photó. This court rejected Jazz Photo’s argument for exhaustion, as to first sales made abroad. The court in Fuji Photo explained that in Jazz Photo “this court expressly limited first sales under the exhaustion doctrine to those occurring within the- United States.” Id. at 1376. Accordingly, exhaustion of U.S. rights is not triggered by “[t]he pat-entee’s authorization of an international first sale.” Id: In Fuji Photo, as in Jazz Photo, the court did not foreclose any argument about express or implied licenses conferred in particular foreign sales.
In short, “this court has'held since 2001 that the foreign sale of a U.S.-patented article, when the “sale is either made or authorized by the U.S. patentee, does not, standing alone, confer on the buyer “authority” to import the item into the United States or to sell and use it here, and so does not save- those acts from being infringing under § 271(a). See Ninestar Tech. Co. v. Int’l Trade Comm’n, 667 F.3d 1373, 1378 (Fed.Cir.2012).[14] The court has *756 not curtailed the ability of an accused in-fringer to show that the patentee conferred such authority by words or implications. Exhaustion cannot rest on a foreign first sale, but an express or implied license might be found based on the circumstances of particular foreign sales.
B
The Supreme Court’s decision in Kirt-saeng does not undermine the no-exhaustion conclusion of Jazz Photo. In Kirtsaeng, the Court interpreted § 109(a) of the Copyright Act, which states that “the owner of a particular copy ... lawfully made under this title ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession .of that copy....” 17 U.S.C. § 109(a). The Court held that § 109(a)’s guarantee is not limited- to copies manufactured in the United States, but applies regardless of the place of manufacture, as long as the maker of the copies had permission from the copyright owner to make them. Kirtsaeng, 133 S.Ct. at 1355-71.
For various reasons, that ruling does not answer the question presented under the Patent Act. Kirtsaeng says nothing about patent law;- and it does not address, even in the context of copyright law, the exhaustion question presented by the Patent Act. Whether a sale constitutes a grant to a buyer of (conclusive or presumptive) “authority” to engage in otherwise-prohibited acts of importation, sale, and use is the question here. It is not the question presented by the Copyright Act. That Act contains no right to exclude anyone from “use,” and § 109(a) of the Act expressly overrides the copyright holder’s rights to exclude from importing or selling copies, permitting acts “without the authority” of the rights owner—in circumstances that undisputedly have nothing to do with the place of sale. The Court in Kirtsaeng merely interpreted- § 109(a) and resolved the dispute about whether the place of manufacture matters under § 109(a), holding—for a number of reasons “taken together”—that it does not. 133 S.Ct. at 1358, 1371. The Kirtsaeng question thus is several steps removed from the question presented under the Patent Act, which requires a quite different analysis.
To elaborate: In Kirtsaeng, the Supreme Court did not advert to the foreign-exhaustion issue under patent law. Nor did it cite, even to distinguish, its own leading case on exhaustion and foreign sales in the patent area, namely, Boesch— which has no counterpart in the copyright area. More generally, the Court nowhere relied on the wealth of exhaustion cases in the patent. area. The absence of such references to patent law, even at a general level, reinforces the need for a distinct patént-law analysis.
The Court has long recognized the distinctness of the copyright and patent regimes and observed that particular questions require separate analysis for each body of law. For example, the Court has noted that the patent right is broader in scope than the copyright right in at least *757 one important respect: the patent statute gives a right to exclude others from “use,” whereas the copyright statute does not. Bauer, 229 U.S. at 13-14, 33 S.Ct. 616. In a decision relied on in -Kirtsaeng, 133 S.Ct. at 1363, the Court stated more generally that copyright-law conclusions and patent-law conclusions do not necessarily' align, so that aj conclusion about copyright law does not automatically carry over to patent law. Bobbs-Merrill, 210 U.S. at 345-46, 28 S.Ct. 722. In Sony Corp. of America v. Universal City Studios, Inc., the Court, noting that patent and copyright law “are not identical twins,” required “caution ... in applying doctrine formulated in one area to the other.” 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). In Eldred v. Ashcroft, the Court explained that “patents and copyrights do not entail the same exchange.” 537 U.S. 186, 216, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003).
The answer to a particular question therefore requires analysis of the specifics of the relevant statute. The Court in Kirtsaeng conducted just such an analysis for the copyright-law question before it. It analyzed a copyright-specific text, namely, § 109(a), and stressed that it was determining “the best reading of § 109(a).” 133 S.Ct. at 1370 (emphasis in original). See id. at 1371 (“we do no more here than try to determine what decision Congress has taken”); id. at 1357 (“We must decide whether the words ‘lawfully made under this title’ restrict the scope of § 109(a)’s ‘first sale’ doctrine geographically.”). And the structure of the Court’s analysis confirms the primacy of the statutory text: The Court began its analysis with an extensive consideration of the text of § 109(a) 133 S.Ct. at 1358-60. It concluded that “[t]he language of § 109(a) says nothing about geography”; reading “made under this title” to mean made with the rights holder’s permission, not to mean made in the United States, “is simple, ... promotes a traditional copyright objective (combatting piracy), and ... makes word-by-word linguistic sense’?;''While the made-in-the-United-States- interpretation “bristles with linguistic difficulties.” 133 S.Ct. at 1358. The Court then found various contextual, historical, and practical considerations to support that textual conclusion. Id. at 1358-62.
The text construed in Kirtsaeng has no counterpart in the Patent Act. And that text presents a sharply different question from the statutory question presented by the Patent Act. By its terms, far from calling for a determination of whether any kind of sale constitutes the conferring of. “authority” from the rights holder, § 109(a) defines the circumstances (ownership of a copy lawfully made) that, when present, give a copy owner a right to sell or dispose of the owned copy “without the authority of the copyright owner.” 17 U.S.C. § 109(a) (emphasis added). Moreover, as we have explained, and as the Court ruled in Kirtsaeng and Quality King, the Copyright Act makes the provisions on exclusivity, infringement, and importation all subservient to § 109(a). In the Copyright Act, the § 109(a) grant to copy owners overrides other requirements of authority from the rights holder, specifically those governing importation and sale. That is not so in the Patent Act, under which exhaustion textually- can be nothing but an answer to a statutory question of when a patentee has, by a sale, conferred such authority.
Section 109(a)’s language, which gives an owner án entitlement to resell “without the authority of the copyright owner,” does not make that entitlement depend on an assessment of whether a first sale made or authorized by the copyright holder confers resale authority on the buyer. The right to resell is given to the “owner” of an article “lawfully made” under the Act. The *758 “owner” language—whose meaning was not at issue in Kirtsaeng—says nothing about where ownership is acquired and does not require a prior sale at all: a copy made by the person who owns it, as long as the making was authorized, is within § 109(a)’s language. See 133 S.Ct. at 1361 (discussing 17 U.S.C. § 115); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.12[B][3][c] (2015). Even when ownership comes from a sale, moreover, the provision prescribes the result for the owner’s resale entitlement in terms not dependent on “authority from the copyright holder but as independent of any such authority. And' the remaining requirement stated by the language at issue in Kirtsaeng—“lawfully made under this title”—undeniably refers only to the manufacture of the copy and whether that manufacture was lawful. That language, like the “owner” language, leaves ño place for consideration of the location of a prior sale (if there was one), which is the issue here.
Years before, deciding Kirtsaeng, the Court in Quality King had made clear that the language of § 109(a) makes sale location irrelevant: under that language, “the owner of. goods lawfully made under the Act is entitled to the protection of the first sale doctrine in an action in a, United States court even if the first sale occurred abroad.” 523 U.S. at 145 n. 14, 118 S.Ct. 1125. The Court in Kirtsaeng confirmed the point. 133 S.Ct. at 1371 (noting the “holding in Quality King that § 109(a) is a defense in U.S. courts even when ‘the first sale occurred abroad’ ”). Not surprisingly, neither party in Kirtsaeng argued that the provision could be read to refer to the sale location.[15] And the Court readily dismissed a safe-location view as “not defensible” and facing “linguistic and other hurdles that ... are insurmountable.” Id. at 1366. With sale location off the table, the dispute in Kirtsaeng was simply between two different interpretations-of-the statutory reference to manufacture (“lawfully made under this title”)—whether it referred to where manufacture occurred (the “geographic” interpretation) or to whether the manufacture was lawful under the standards of-the Copyright Act (e.g., with the copyright owner’s permission, as opposed to pirated). For that reason, whether an “implied license” would arise from sales in some" circumstances was immaterial to the statutory question being debated, and the Court did not comment on that notion, despite its mention in the dissent, 133 S.Ct. at 1389 & n. 25 (Ginsburg, J., dissenting), and the government’s brief, Brief for the United States as Amicus Curiae Supporting Respondent at 21, Kirtsaeng (No. 11-697), 2012 WL 3902599.
In short, given the nature of the question framed by § 109(a), the Court in Kirtsaeng’ did not have occasion to decide, and did not decide, whether a foreign sale (by or authorized by the U.S. rights hold *759 er) is properly treated as conferring on the buyer, conclusively or presumptively, the authority to resell. The Court did not decide, even for copyrights, the question presented here for patents.
The nature of the statutory question decided in Kirtsaeng also shows why the Court’s discussion of considerations supporting its textual conclusion cannot be transposed to the patent-law setting at issue here. The discussion of the statutory history and certain provisions of the Copyright Act, 133 S.Ct. at 1360-62, 1370, is statute-specific. And the Court’s discussion of the absence of any constitutional history or congressional action permitting market division was limited to the copyright area. Id. at 1370-71. Compare 35 U.S.C. § 261 (patentee may assign rights “to the whole or any specified part of the United States”).
Similarly, the Court’s discussion of Lord Coke’s 1628' description of his country’s general judicial personal-property law, id. at 1363-64, is inapplicable here. That description, as already explained, is apt background for a provision, like § 109(a), that is superior to any legislative grant of rights that cover post-purchase activities of a buyer. The Patent Act contains no such override of the Act’s grant of rights to patentees. And the Court in Kirtsaeng drew from Lord Coke’s description only a general recognition of “the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods,” adding that American antitrust law recognizes a similar point. 133 S.Ct. at 1363. That observation merely confirms that the result of the § 109(a) analysis is sensible because it fits one policy found in aspects of American and British law containing no specific statutory override. And the Court then cited Bobbs-Merrill, which construed the pre-1909 copyright statute not to contain an override in the circumstances at issue, 210 U.S. at 349-51, 28 S.Ct. 722, and noted that the next year, Congress adopted that result by enacting the statutory predecessor of § 109(a). Kirtsaeng, 133 S.Ct. at 1363-64.
In addition, the Court’s account of the potential real-world consequences of the statutory ‘ interpretation it was rejecting, though it mentions sale location a few times, is pervasively tied to the issue actually in dispute—whether' a foreign manufacture location makes § 109(a) inapplicable. 133 S.Ct. at 1364-67. Under that interpretation, the Court stated, the rights holder would have “permanent” control, id. at 1362, “perpetual downstream control,” id. at 1371, of copies circulating in the United States as long as those copies had been made abroad: § 109(a) would not kick in to give resale rights to purchasers of those copies even if the copyright holder sold the article in the United States. See also id. at 1366 (referring to “the^ absurd result that the copyright owner can exercise downstream control even when it authorized the import or first sale”). As the government notes to us, the Patent Act, which lacks a provision like § 109(a), is quite different: “there is no concomitant risk of ‘perpetual downstream control’ over patented goods.” U.S. Br. 24. At the very least, an unrestricted patentee-made or -authorized sale in the U.S. triggers exhaustion as to the article sold.
Moreover, the “copyright-related consequences” emphasized by the Court in Kirt-saeng, 133 S.Ct. at 1367, were to a large extent, though not entirely, tied to the distinctive problems of museums, libraries, and booksellers. Id. at 1364-67. To that extent, the Court’s overall analysis of plausible practical effects—of an interpretation keeping every foreign-made copy forever outside § 109(a)—was copyright-specific. The Court in Kirtsaeng also concluded *760 that circuit-court precedent on § 109(a) was too fractured to give meaningful comfort that the practical problems from the Court’s adoption of Wiley’s view of § 109(a) were unlikely to materialize. Id. at 1366. In contrast, our exclusive'jurisdiction and clear rule since 2001, together with the pre-2001 precedents from other courts, provide considerably more reason to discount predictions that adhering to a territorial line.to make exhaustion unavailable based on a foreign sale will result in serious practical problems.
For all of those reasons, Kirtsaeng is not controlling in this case. The patent-law issue presented here requires a separate analysis in its own legal setting.
C
The Patent Act question is whether a foreign sale of a U.S.-patented article made or authorized by a U.S. patentee, standing alone, confers on the buyer authority to import the article into the United States and sell and use it here, even though such an act would be infringing in the absence of authority. The best answer to that question, we conclude, is that such a foreign sale does not confer such authority. .A U.S. patentee, simply by making or authorizing a foreign sale of an article, does not waive its U.S. rights to exclude regarding that article, either conclusively (no matter how clear the reservation of U.S. rights) or only presumptively (subject to sufficiently clear preservation of U.S. rights).
1
The combined logic of the statutory grant of patent rights and the long-recognized basis for exhaustion leads naturally to rejecting exhaustion based on a foreign sale. The statute gives patentees the reward available from American markets. A patentee cannot reasonably be treated as receiving that reward from sales in foreign markets, and exhaustion has long been keyed to the idea that the patentee has received its U.S. reward.
Thus, what the statute expressly provides to a U.S. patentee is the reward available from the right to exclude “in the United States.” See 35 U.S.C. §§ 154(a)(1), 271(a).[16] The reward is inherently a market reward: “it is one of the legal beauties of the system that what is given by the people through their government—the patent right—is valued automatically by what is given by the patentee. His patent has value directly related to the value of his invention, as determined in the marketplace.” In re Kirk, 54 CCPA 1119, 376 F,2d 936, 964 (1967) (Rich, J., dissenting).[17] And the market reward, un *761 der the statute, is explicitly the reward available from American markets subject to American laws, a reward obtained by selling or authorizing sales in those markets.
At the same time, the Supreme Court has “explained the basis for [exhaustion] doctrine” in terms of the patentee’s receipt of the reward given by the statute. Bowman, 133 S.Ct. at 1766. “‘The purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward ... by the sale of the article.’ ” Id. (quoting Univis, 316 U.S. at 251, 62 S.Ct. 1088, itself citing earlier authorities). Only when it is appropriate to assume the receipt of that reward does the sale support an inference of conferral of authority on an article’s buyer (in the absence of clearly communicated restrictions on the authority conferred).
Whatever other issues may be presented by determining when a patentee has “received his reward,” the territorial nature of the statutory guarantee supplies a simple, strong reason to exclude foreign sales. The guarantee is the reward from sales in American markets, not from sales in foreign markets. A sale in a foreign market therefore does not furnish “th'e basis for” Exhaustion—even for a presumption that authority is being conferred on the buyer to exploit the article in American markets by the actions (importation, sale, use, etc.) that are infringing in the absence of paten-tee-conferred authority.
American markets differ substantially from markets in many other countries, and not just because of disparities in wealth that can lead to dramatically different prices (especially for low-marginal-cost products). Government policies differ dramatically, including policies on price regulation and, most particularly,. policies oh the availability and scope of patent protection. Patents involve costly government-approval processes, and the standards vary.[18] The government explains:
The independence of national patent systems ... is one of the defining principles of the international legal regime governing the protection of inventions. The United States has ratified the Paris Convention for. the .Protection of Industrial Property, originally adopted more than a century ago, which specifically provided in Article J¡.bis that “Patepts applied for in the different contracting States .... shall be,independent of the *762 patents obtained- for the same invention in the other States 32 Stat.1936 (Aug. 25, 1902). While international agreements facilitate the ability of inventors in- one country to seek patent protection in others, the patents laws of each country are not reciprocal in their protections for particular inventions. As every patent attorney knows, the United States may issue a patent while another country denies protection for the same invention, or approves claims significantly different in scope.
U.S. Br. 15-16.
Copyrights are different. They generally spring into being without any. government approval, and standards hardly vary compared to patenting standards. As the government says, “patent law is different from copyright law, under Which authors automatically ‘enjoy copyright protection in nations across the globe’ pursuant to the Berne Convention for the Protection of Literaryand Artistic Works.” U.S. Br. 16 (quoting Golan v. Holder, — U.S. —, 132 S.Ct. 873, 878, 181 L.Ed.2d 835 (2012)); see Golan, 132 S.Ct. at 878 (referring to “Bertie’s 164 member states”).[19] And there is no reason to think that the costs of copyright registration (not even a prerequisite to all copyright protection) are generally comparable to those of securing patent protection.[20]
Given the varying' standards, and- the separate examination processes and fees, a U.S. patentee may choose not even to seek patent protection in particular foreign countries. And those seeking protection may not obtain it, .or may not obtain protection comparable to thát-of the U.S. patent. In either event, foreign sales in such circumstances may not occur under protections likely to produce market returns comparable to the reward contemplated by our patent law. Such country-to-country differences in patent law, moreover, are only part of the likely differences affecting foreign sales, supplementing differences in economic circumstances and in governments’ price and other non-patent regulations bearing on sales.
For those reasons, a foreign sale, standing alone, is not reasonably viewed as providing the U.S. patentee the reward guaranteed by. U.S. patent law. Such a sale is not reasonably viewed as itself a waiver by the patentee of its U.S. patent rights to prevent the buyer or others from bringing that article into the United States and selling or using it to satisfy a U.S.-market demand that the patentee could otherwise help satisfy at U.S.-market prices, as guaranteed by the Patent Act.
2
The only Supreme Court decision directly addressing the effect of a foreign sale on U.S. patent rights is the 1890 decision in Boesch v. Graff, 133 U.S. 697, 10 S.Ct. 378. Albert Graff and J.F. Donnell, by assignments, held an 1883 U.S. .patent on certain lamp burners. Without their permission, Emile Boesch and Martin Bauer sold pat *763 ent-covered burners in the United States. Boesch and Bauer had bought those burners from a supplier in Germany, without permission from the holders of the rights under German patents (dated 1879-1880), which had been issued to the same individuals as the U.S. patent. The German supplier was authorized to make.the sale to Boesch and Bauer, not by the German patentees, but by a German law that allowed continuation of certain preparatory activities that began before the application for the German patents was filed. 133 U.S. at 698-99, 701-02, 10 S.Ct. 378, When Graff and Donnell sued Boesch and Bauer for infringement, the single-judge circuit court for the Northern District of California found infringement, and the Supreme Court affirmed that holding. Id.
The Court rejected Boesch and Bauer’s defense that they “could not be held for infringement, because they purchased the burners in Germany from a person having the right to sell them there, though not a licensee under the German patents.” Id. at 699, 10 S.Ct. 378. The Court stated “the exact question presented [a]s whether a dealer residing in the United States can purchase in another country articles 'patented there, from a person authorized to sell them, and import them to and sell them-in the United States, without the license or consent of the owners of the United States patent.” Id.. at 702,10 S.Ct. 378. In answering the question, the Court recited the then-leading decisions on domestic exhaustion, culminating , in Adams, which, the Court observed, held that, within the confines of the United States, the courts would not add an unexpressed territorial limit to the rights conferred by an unrestricted sale by a regional assignee. Id. at 703, 10 S.Ct. 378. The Court then concluded that the cross-border situation was different. Its full rationale was as follows:
The right which [the German seller] had to make and sell the burners in Germany was allowed hini under the laws of that country, and • purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under' a United States patent. A prior foreign patent operates under our law to limit •the duration of the subsequent patent here, but that is all. - The sale of articles in the United States under a United States patent cannot be controlled by foreign laws. ■ .

Id.

That rationale by its terms does not make relevant whether the foreign sale was made under á foreign patent. Indeed, the second sentence says that a “prior foreign patent” does not cause loss of U.S'. patent rights. Rather, the. rationale turns only on the fact that the foreign sale was made under foreign law.[21] The last sentence states the territorial principle: “The sale of articles in the United States under a United States patent cannot be controlled by foreign laws.” Id.
That principle does not preclude an accused, infringer from establishing that the U.S. patentee actually gave it a license, expressly or by implication. .It means that the. exhaustion doctrine does not treat a foreign sale, lawful abroad for whatever reason, as having the .cross-border legal effect of authorizing otherwise-infringing U.S. acts involving the purchased article. And that is how the principle has been understood by the Supreme Court. See *764 Keeler, 157 U.S. at 664-65, 15 S.Ct. 738 (“The exact question presented was whether a dealer residing in the United States could purchase in another country articles patented there from a person authorized there to sell them; and import them to and sell them in the United States without the license or consent of the owners of the United States patent, and the court held that the sale of articles in the United States under a United States patent cannot be controlled by foreign laws. In this case neither the patentee nor any assignee had ever- received any royalty or given any license to use the patented article in any part of the United States.”); A. Bourjois & Co. v. Katzel, 260 U.S. 689, 692, 43 S.Ct. 244, 67 L.Ed. 464 (1923) (trademark case, explaining: “Ownership of [particular] goods ... does not necessarily carry the right to sell them at all in a given place. If the goods were patented in the United States a dealer who lawfully bought similar goods abroad from one who had a right to make and sell them there could not sell them in the United States. Boesch....”).
. The principle of Boesch, precluding foreign control of U.S. rights, has a mirror-image counterpart in the territoriality principle of U.S. patent law that, broadly denies projection of U.S. patent rights to cover foreign conduct. In Brown v. Duchesne, 60 U.S. (19 How.) 183, 15 L.Ed. 595 (1857), the Supreme Court, referring to the patent statutes, said that “these acts of Congress do not, and were not intended to, operate beyond the limits of the United States.” Id. at 195. The Court also explained the guaranteéd reward from domestic markets: the patent laws “secure to the inventor a just remuneration from those who derive'a profit or advantage, within the United States, from his genius and mental labors.” Id.; see, e.g., Dowagiac, 235 U.S. at 650, 35 S.Ct. 221 (“The right conferred by a patent under our law is confined to the United States and its territories (Rev.Stat. § 4884, Comp.Stat. 1913, § 9428), and infringement of this right cannot be predicated of acts wholly done in a foreign country.”).
The Supreme Court relied on the strength of the territorial principle in Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), which rejected a claim of infringement against Deepsouth just because the ultimate combination covered by the patent was máde abroad, after Deepsouth shipped all the parts from the United States. The Court explained:
Our patent system makes no claim to extraterritorial effect; “these acts of Congress do not, and, were not intended to, operate beyond the limits of the United States,” Brown v. Duchesne, 19 How., at 195 (1856), ánd we correspondingly reject the claims of others to such control over our markets. Cf. Boesch v. Graff, 133 U.S. 697, 703 [10 S.Ct. 378] (1890).
406 U.S. at 531, 92 S.Ct. 1700.
In Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007), the Supreme Court quoted the foregoing passage from Deepsouth .as support for “[t]he traditional understanding that our patent law ‘operate[s] only domestically and do[es] not extend to foreign activities,’ ... [which] is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States. 35 U.S.C. § 154(a)(1) (patentee’s rights over invention apply to manufacture, use, or sale ‘throughout the United States’ and to importation ‘into the United States’).” Id. at 455, 127 S.Ct. 1746. And the Court added:
As a principle of general application, moreover, we have stated that courts should “assume that legislators take account of the legitimate sovereign inter *765 ests of other nations when they write American laws.” F. Hoffmann-La Roche Ltd. v. Empagran S. A., 542 U.S. 155, 164 [124 S.Ct. 2359, 159 L.Ed.2d 226] (2004); see EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 [111 S.Ct. 1227, 113 L.Ed.2d 274] (1991). Thus, the United States accurately conveyed in this case: “Foreign conduct is [generally] the domain of foreign law,” and, in the area here involved, in particular, foreign law “may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions.” Brief for United States as Amicus Curiae 28.
Id. (emphasis added). The Court then applied the presumption of congressional respect for territorial limits in patent law to interpret the very provision, § 271(f), that Congress had enacted (in 1984) to supersede Deepsowth, explaining that the presumption “remains instructive in determining the extent of the statutory exception” to the strict territorial limits elsewhere stated in the statute. Id. at 456, 127 S.Ct. 1746.
The principles thus expressed, perhaps especially the sentence highlighted in the quote just above, recognize what we noted above: Patent law is especially territorial, and laws vary considerably from country to country. The Supreme Court’s recognition of those points reinforces our conclusion that foreign markets are not the predictable equivalent of the American markets in which the U.S. patentee is given a right to exclude and the rewards from that exclusivity. The Courfis closest patent-law precedents thus support our holding that sales in foreign markets should not be presumed to confer on the buyer authority to displace sales in American markets.
3
Congress has not enacted a general provision of the Patent Act specifically addressed to foreign-sale exhaustion of U.S. patent rights. Congress has left the general issue to judicial resolution.
When the subject arose in the, Uruguay round of multilateral negotiations that led to the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), the parties agreed not to address the subject, stating, in article 6, that “nothing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights.” TRIPS, Apr. 15, 1994, 33 I.L.M. 1197, 1200, quoted in Kirtsaeng, 133 S.Ct. at 1383 (Ginsburg, J., dissenting). And when Congress implemented the. international agreement through the 1994 legislation that (among other things) added the new importation ban to § 271(a); the accompanying Statement of Administrative Actipn—which Congress deemed authoritative, 19 U.S.C. § 3512(d)—stated that “[t]he Agreement ... does not affect U.S. law or practice relating to parallel importation of products protected by intellectual property rights.” H.R.Rep. No. 103-316, at 633, 981 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4280. The recent Trans Pacific Partnership agreement[5] includes a similar disclaimer, reserving the parties’ rights to make other international agreements on the subject. See Trans-Pacific Partnership art. 18.11 & n. 8, Oct. 5, 2015, https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacificpartnership/tpp-full-text.
Congress did act in three specific instances formally to guarantee a U.S. pat-entee the right to retain its U.S. rights despite selling abroad. Congress so provided through legislation, adopted by both houses and signed .by the President, that approved three international agreements. United States-Morocco Free Trade Agree *766 ment Implementation Act, Pub.L. No. 108-302, 118 Stat. 1103 (2004);[22] United States-Australia Free Trade Agreement Implementation Act, Pub.L. No. 108-286, 118 Stat. 919 (2004);[23] United States-Singapore Free Trade Agreement Implementation Act, Pub.L. No. 108-78, 117 Stat. 948 (2003).[24] ( In doing so, Congress did not provide the promised rights other than, through the existing Patent Act provisions of §§ 154, 271.
Those congressionally approved guarantees. would be negated if Impression’s view of the Patent Act were adopted: U.S. patentees would lose their U.S. patent rights - by -selling abroad. Ah interpretation of a statute that produces such a contradiction with-other enactments is-to be avoided, at least where other considerations already point against such ah interpretation. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 539, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 100, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The three congressional enactments thus provide a further reason to reject Impression’s view. At the same time, they leave to our internal law—the Patent Act, as judicially interpreted—whether even a presumptive-exhaustion rule governs. The agreements say nothing to undermine our reasons for rejecting a presumptive-exhaustion rule.
The only other legislative enactment presented for our consideration is 21 U.S.C. § 381(d)(1)-(2). Paragraph (1) of that, subsection states, a general rule that “no drug subject to section 353(b) of this title [concerning prescription-necessitating drugs] or composed wholly or partly of insulin which is manufactured in a State and exported may be imported into the United States unless the drug is imported by the manufacturer of the drug.” The general rule is subject to one exception, stated in paragraph (1), for certain prescription drugs imported by pharmacists and wholesalers from Canada, as regulated *767 under 21 U.S.C. § 384. And it is subject to a second exception stated in paragraph (2), which authorizes the Secretary of Health and Human Services to permit importation otherwise within the paragraph (-1) ban “if the drug is required for emergency . medical care.” 21 U.S.C. § 381(d)(2).
That provision does not alter our conclusion. The provision does not purport to h'mit patentees’ rights regarding importations under 35 U.S.C. §§ 154, 271. It adds an express government-enforced ban on certain importations, and it makes certain exceptions to the added ban, authorizing the Secretary to allow certain importations. Perhaps where the Secretary does so, an injunctive remedy might be unavailable to the patentee under 35 U.S.C. § 283, for public-interest reasons. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). But nothing in 21 U.S.C. § 381(d) makes non-infringing any conduct that otherwise would be infringing.
Congress may modify patentees’ rights under the Patent Act. It may do so with respect to particular articles, without modifying the general exhaustion rale for foreign'sales under the Patent Act—though § 381(d) does not do even that. Or it may more generally prescribe a general exhaustion rale for patented articles, specifying the conditions for exhaustion, as it did in the Copyright Act for copyrighted works. But it has not done that either.
4
Our no-exhaustion conclusion—which leaves undisturbed the availability of an express- or implied-license defense to infringement—4s broadly consistent with the decisions of courts other than the Supreme Court, with the apparent exception of a trial-court decision that pre-dates Boesch.
The pre-Boesch decision is Holiday v. Mattheson, 24 F. 185 (C.C.S.D.N.Y.1885), in which few facts are set out. The defendants bought some U.S.-patented article in England from “a vendee of the patentee,” “without restriction or conditions.” Id. at 185. The-court denied the patentee’s motion for a preliminary injunction against U.S. activities involving the article. It reasoned that, whether or not an article is patented, “[w]hen the owner sells an article without any reservation respecting its use, or the title which is to pass,” “[t]he presumption arising from such a sale is that the vendor intends to part with all his rights in the thing sold”; and a patentee-seller “parts with his monopoly” as to that article—“unless by the conditions of the bargain the monopoly right is impressed upon the thing purchased,” i.e., unless “the owner of a patent sells the patented article under circumstances which imply that the purchaser is not to acquire an unqualified property in the thing purchased.” Id. at 185-86. That description, with its emphasis on the absence or presence of patentee-conveyed restrictions on post-purchase use, is taken entirely from domestic exhaustion law. The court said nothing to recognize that a, distinct issue is presented when the sale was made abroad; and the opinion, describing few facts, does not make clear even indirectly if the circumstances would have given rise to an im-. plied-license defense. In any event, just a few years after the.trial-court decision in Holiday, the Supreme Court in Boesch made clear how much the crossing of international boundaries matters.
After Boesch, the Second Circuit in Dickerson v. Matheson, 57 F. 524 (2d Cir. 1893), affirmed a finding of infringement against Matheson & Co., which had acquired from a German seller in 1887, and brought into the United States for sale and use here, batches of a coloring agent that was subject to a U.S. patent and a German *768 patent, both assigned to the Bayer Company. The German seller (the Berlin Company) was a licensee of the Bayer Company,- with the right to sell both in Europe and the United States, and it made clear that importation into the United States was prohibited. Id. at 525-26. In the suit brought by Dickerson, to whom the Bayer Company assigned the U.S. patent'in 1888, the Second Circuit rejected Matheson’s defense to infringement. It read Boesch to establish that “[a] purchaser in a foreign country of an article patented in that country and also in the United States, from a licensee under the foreign patent .only, does not give the purchaser a right to import the article into, and to sell it in, the United States, without the license or consent of the owner of the United States patent.” Id. at 527.
The Eighth Circuit reached a similar result in Dickerson v. Tinling, 84 F. 192 (8th Cir.1897), involving Bayer & Co.’s phenacetine product. The court noted that “it appears that no patent [on the product] had ever been issued in Germany” and that “every package of phenacet-ine thát had ever been sold by Bayer & Co. in a foreign country had a prohibition against its importation into and sale within the United States printed upon it, and was sold subject to that prohibition.” Id: at 193; It was unclear whether Tinling bought the phenacetine at issue from Bayer & Co. (or its' vendees) or from “others,” but it did not matter to the outcome. Id. at 194. “If he bought it of others than Bayer & Co. or their vendees, he bought with it no right to sell it in the'United States, because no one but Bayer & Co. and their vendees had that- right in this country.” Id. “On the other hand, if [Tinl-ing] bought the phenacetine he is selling in a foreign country from Bayer & Co., or from its vendees, subject to the express condition that it should not be imported into the United States, or sold within their limits, the exclusive right to sell the patented article within the United States which was granted to Bayer & Co. by the patent was not abridged by that purchase.” Id.
The Eighth Circuit pointedly noted that it did not have to decide what the result would be if no restrictions attended a sale made or approved by Bayer. It said: “Conceding—but not deciding—that one who buys a patented article without restriction in a foreign country from the owner of the United States patent” is clear of the U.S. patent for domestic sale and use, id, at 195 (citing Holiday and Matheson), “there can be no doubt that a paten-tee has the same right and power to sell the patented- article upon conditions or with restrictions that he has to sell it at all,” id. With Bayer having “sold on the express condition that [the phenacetine] should not be imported into or sold within the United States,” Tinling’s, domestic sale of the purchased product was infringing. Id. The Eighth Circuit thus reversed the trial court’s denial of an injunction and ordered an injunction to issue. Id.
The Second Circuit likewise reversed the denial of infringement relief in Daimler Manufacturing Co. v. Conklin, 170 F. 70 (2d Cir.1909). The U.S. holder of certain automobile-component patents (Daimler) sought to enjoin the use in the United States of a vehicle containing such components. Conklin had bought the vehicle in Europe, under no restrictions as to importation into or use within the' United States, from a company licensed to sell it in Europe by the holder of European patent rights—a company distinct from the U.S. patent-holding company, though with common origins and some overlapping ownership involving the inventor Maybach, see Daimler Manufacturing Co. v. Conklin, 160 F. 679 (C.C.S.D.N.Y.1908). The Second Circuit, based on Boesch, concluded: *769 “The use of articles covered by a United States patent within the United States can no more be controlled by foreign law than the sale can.- The sale by a German paten-tee of a patented article may take it out of the monopoly of the German patent, but how can it take it out of the monopoly of the American patentee who has not sold?” 170 F. at 72.
In 1920, the Second Circuit affirmed the denial of relief where it was clear from the circumstances that the U.S. patentee had granted permission for otherwise-infringing U.S. activities with airplanes bought in Canada. Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng’g Corp., 266 F. 71 (2d Cir.1920). Curtiss was the holder of U.S. patents on various airplane-engine technologies. During World War I, an 83-percent-owned Canadian subsidiary of Curtiss (which the court treated as .indistinguishable from Curtiss) granted a license—covering.its Canadian patents and applications and any further inventions it owned or controlled involving changes to the engines at issue—to an entity created by the British government, authorizing the latter to make airplanes for sale to and use by the British government. Id. at 72-74. The British government bought planes during the war and, after, the war ended, sold some of them to United Aircraft, which brought them into the United States for sale and use here. Id. at 72, 74. When Curtiss sued, the dispute was over whether “the authorization to make was general and unrestricted or subject to qualification and conditions, as to the disposition of the planes by the British government.” Id. at 77; id. at 75.
The Second Circuit, agreeing with the district court, concluded that the authorization gave the British government freedom from U.S. patent constraints, on what it could do with the planes. The court relied on “the very nature of things” and “the language used in the agreements.” Id. at 75. It explained that “[a]n aero-plane has been said to be the most mobile article manufactured, and it is not confined by geographical boundaries,” id.; that the British had used airplanes in numerous countries during the war, id.; and that “the aviation fields in Texas and in other statés were placed at the disposal of the British authorities and were actually used by them as training fields for Canadian aviators,” id. It concluded: “[Curtiss] and the British government alike understood and intended that the aeroplanes to be manufactured by that government as well as those to be supplied to -it- by [Curtiss] were to become the absolute property of the government, and were to be disposed of as the latter should see fit. The express language of the contract is that the aero-planes and other articles should ‘become and be the absolute property of the British government.’ ” Id.
Some decisions of district courts from decades later round out the picture of case law predating Jazz Photo. Judge Lord rejected an exhaustion defense in Griffin v. Keystone Mushroom Farm, Inc., 453 F.Supp. 1283 (E.D.Pa.1978). Griffin was the owner of the US. patent, as well as Italian patents, covering certain machinery. Keystone bought several machines in Italy from Griffin’s exclusive licensee in Italy and brought them into the United States, one for use, two for sale. Griffin sued Keystone for infringement, and Keystone sought summary judgment based on exhaustion. Judge Lord rejected the defense.
He read Boesch to apply,' because in Boesch “[t]he source of the alleged infringer’s authorization under foreign law ... was without significance in the Court’s reasoning.” Id. at 1285. Therefore, it did not matter whether Griffin “owned concurrent United States and Italian patents and had *770 entered into analogous licensing agreements. concerning the same inventions,” giving Griffin a share of royalties from the Italian and American exclusive licensees. Id. “[T]he basic thrust of the Boesch decision” was “that the ‘sale of articles in the United States under a United States patent cannot be controlled by foreign laws.’ ” Id. at 1286 (quoting 133 U.S. at 703, 10 S.Ct. 378).
In Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., 565 F.Supp. 931(D.N.J. 1983), Judge Sarokin denied a preliminary injunction to U.S. patentee Sanofi, S.A., but granted one to U.S. exclusive licensee American Home Products. A Sanofi subsidiary in France sold to an American processor certain pharmaceutical products covered by Sanofi’s U.S. patent; the subsidiary “placed no restrictions in the sales contract,” and Sanofi had no French patent. Id. at 938; see also id. at 934-35. When the buyer brought the products to the United States for sale, both Sanofi and American Home Products sued.
The court concluded first that “if Sanofi were permitted to impose restrictions upon the resale of its patented product, the expectations of the purchaser would be defeated.” Id. at 938 (emphasis added). “[W]here the owner of a patent exhibits conduct from which one dealing with him may properly infer that the owner consents to his use of the patent,.an implied license will arise.” Id. at 940 (citing De Forest Radio, 273 U.S. at 241, 47 S.Ct. 366). But a different conclusion was required as to American Home Products, the U.S. exclusive licensee, the court reasoned, which did not cede its patent rights. “Because the purchaser is under an obligation to inquire of the seller as to the existence of any outstanding licenses, the purchaser cannot claim that his expectations have been frustrated if he fails to make the necessary inquiry and later discovers that an outstanding license interferes with his right of enjoyment.” Id. “If the court were to hold that Sanofi’s sale of the product exhausted the patent, it would be crediting Sanofi with greater rights than the patentee actually had. Sanofi had no right to allow its. product to enter this country without the permission of its exclusive licensee.” Id. at 941.[25]
All of the foregoing decisions after Boesch reflect both (a) the Boesch principle that foreign laws do not control domestic patent rights and (b) some assessment of the particular circumstances and language of foreign sales to determine if the U.S. patentee gave permission for importation. The pre-Boesch decision in Holiday aside, the results accord with the Jazz Photo no-exhaustión rule coupled with the availability of a defense based on an express or implied license. That combination of principles, supported in the statute and Supreme Court doctrine, provides a clear doctrinal statement that fits the pre-Jazz Photo case law from outside the Supreme Court.
5
Finally, we consider what we can reliably gauge about the likely real-world consequences of one answer or another to the exhaustion question presented here. As on the first issue before us, the amicus briefs filed here present competing arguments about the effect of one foreign-sale exhaustion rule or another on them interests and the interests they promote, offering varying amounts of empirical support. Such arguments necessarily play a much *771 more limited role for us than they might for Congress. As on the first issue, all that we can conclude is that we see no basis for altering the conclusion we think warranted by the legal sources already considered.
a. We have not been shown that substantial problems have arisen with the clear rule of Jazz Photo, which has been in place since 2001, or with the comparable legal understandings based on a century of case law in the area. There is, of course, the possibility—noted by the Dissent at 787, citing amici’s assertions—of unintend- • ed infringement by buyers of goods in foreign countries who bring them into the United States, whether to use them as components in new goods they make, to sell them, or to use them as consumers. But that possibility is limited by the availability of an implied-license defense from the circumstances of a sale (perhaps, e.g., an unrestricted patentee sale at a seaport or airport to a buyer loading or boarding a vessel or plane bound for the United States). In addition, a large share of such possible unintended infringement, according to the most common policy complaint by electronics-industry amici, is by definition immaterial to any exhaustion—namely, infringement of patents asserted by non-practicing entities that have neither made nor authorized the sale of patent-covered articles. The only scenario relevant to exhaustion is one involving paten-tee-made or, -authorized foreign sales, and we simply have no reliable evidence that the possibility of unintended infringement in that scenario is actually a significant issue in practice. The absence of such evidence in the many years since Jazz Photo, and the still longer period since Boesch, provides good reason to think otherwise.
Indeed, it has long been a feature of the patent-law landscape that there can be instances of innocent infringement, because § 271(a) sets a “strict-liability” standard. Commil USA, LLC v. Cisco Systems, Inc., — U.S. —, —, 135 S.Ct. 1920, 1926, 191 L.Ed.2d 883 (2015). Thus, even domestic purchasers of products from domestic sellers who have not obtained authority from the owners of patents covering the products’ components could find themselves in that position. But Congress has left strict liability in place, even in light of the scenario not relevant to exhaustion, i.e., patent infringement claimed by non-practicing-entity patentees that have neither made nor authorized the sales at issue. In any event, despite the law in place since Jazz Photo and for decades earlier, there is no reason to think that this is a distinctive problem for foreign-purchased goods, much less a problem affecting a meaningful share of foreign sales leading to imports.
In this respect, we have no, reason to think that the most serious real-world problems described in Kirtsaeng carry over to the patent arena.' Prominent among the problems' in Kirtsaehg Were those that would be faced, under the rejected interpretation of § Í09(a), by libraries, museums, and bookshops. Those entities often would' be dealing on a regular basis with changing inventories' of large numbers- of individually distinct lóng-shelf-life works subject to copyrights that have multiple owners and that last for periods far longer than the terms of patents (and variable with the life of the authors). See Eldred, 537 U.S. at 194-96, 123 S.Ct. 769 (describing copyright terms). And there was good reason to think that they built up “deeply embedded” reliance interests in the absence of clear law pointing, against § 109(a)’s applicability just because a work was made abroad. Kirtsaeng, 133 S.Ct. at 1366. If there is a counterpart to such situations in , the patent arena, it has not been shown to loom large in the full range *772 of circumstances governed by the answer to the question of foreign-sale-exhaustion.
b. Overturning Jazz Photo would plausibly cause significant disruption of existing practices adopted under the contrary law established by Jazz Photo' and decades of prior case law. Such disruption is most likely if exhaustion of U.S. rights were held to follow from a foreign sale without the U.S. patentee having the ability to reserve its U.S. rights. While a conclusive-exhaustion rule is opposed by the government, it is the rule urged by Impression and certain amici that stress the possibility of unintended infringement we have just discussed.
An example of likely disruption involves pharmaceutical products. There seems to be no dispute that U.S.-patented medicines are often sold outside the United States at substantially lower prices than those charged here and, also, that the practice could be disrupted by the increased arbitrage opportunities that would come from deeming U.S. rights eliminated by a foreign sale made or authorized by the U.S. patentee.[26] One official recognition of both the fact of low prices abroad and the linkage of such prices to territorial resale protection appears in a 2003 World Trade Organization decision made with the agreement. of the United States. The WTO there waived certain TRIPS patent-recognition provisions in order to allow certain countries to import generic versions of needed medicines. The WTO took care, however, to condition the waiver on agreement by the importing, countries “to control re-exportation of drugs they import in this fashion.” Ganslandt & Mas-kus, at 1036 (discussing WTO General Council, Implementation of paragraph 6 of the Doha Declaration on the TRIPS Agreement and Public Health, Aug. 30, 2003, www.wto.org/english/tratop_e/trips_ e/implem_para6_e.htm). Reversing Jazz Photo and replacing it with a conclusive-exhaustion rule would likely upset such established practices.
c. A presumptive-exhaustion rule, subject to some kind of preservation of U.S. rights by the U.S. patentee when making or authorizing a foreign sale, would be less consequential. After all, to try to negate a potential implied-license defense, U.S. pat-entees would have an incentive to make express reservations of U.S. rights in making or authorizing foreign sales, simply to make clear that no license was being conferred. But even for the U.S. patentees that recognize the incentive and try to act on it, whether there is a presumptive loss of U.S. rights makes a difference. In particular; it makes a difference—-though we cannot say just how significant—who has the burden of proof on the issue: must the patentee prove a reservation (communicated to the accused infringer) to avoid exhaustion, or must the accused infringer prove a license?
A U.S. patentee that wishes to reserve its U.S. rights may not be able to do so. For a foreign sale, the required reservation is an act in a foreign country. And the foreign sovereign, or local governments in the country, may prohibit sellers *773 from stating reservations of rights that would make importation into and sale in the United States more difficult.
A presumptive-exhaustion rule would place a U.S. patentee’s preservation of U.S. rights within foreign sovereign control. For doctrinal reasons already emphasized, we should avoid attributing to Congress such a ceding of control over domestic rights to foreign sovereigns without clearer reason than we have seen here. The Supreme Court’s final statement of its rationale in Boesch says as much: “The sale of articles in the United States under a United States patent cannot be controlled by foreign laws.” 133 U.S. at 703, 10 S.Ct. 378. Indeed, such foreign control of U.S. rights is a mirror image of projecting U.S. patent rights into foreign sovereigns’ territories. The Supreme Court has long recognized that the latter is strongly disfavored in reading the Patent Act. See pages 763-65, supra. And since Boesch, the Court has twice recognized the symmetric impropriety of:reading the Patent Act to allow projection of foreign sovereigns’ decisions to control rights in U.S. territory: “Our patent system makes no claim to extraterritorial effect;;‘these acts of Congress do not, and were not intended to, operate beyond the limits of the United States,’ Brown v. Duchesne, 19 How., at 195; and we correspondingly reject the claims of others to such control over our markets. Cf. Boesch v. Graff, 133 U.S. 697, 703, 10 S.Ct. 378 (1890).” Deepsouth, 406 U.S. at 531, 92 S.Ct. 1700; see Microsoft, 550 U.S. at 455, 127 S.Ct. 1746.
In practical terms, moreover, there is a plausible problem with adopting a presumptive-exhaustion rule, compared to leaving the matter to express- of implied-licensip doctrine. Intermediary companies between the foreign purchase and the importation into the United States may be created that make it difficult for the U.S. patentee to carry an affirmative burden of proving adequate notice of reservations attached to a foreign-sold article. Once.the article leaves the hands of the initial seller (the U.S. patentee or its authorized seller), the U.S. patentee seems likely to have limited knowledge about the movement of the article to U.S. markets, through what may be multiple hands. On the other hand, if the burden is on the U.S. importer/seller to establish a conferral of authority, as it is under the express- or implied-license doctrine, there would be incentives to communicate a conferral of authority reliably throughout the chain of custody on the way .to the U.S. importer and seller. That is because the latter, at the end of supply chain, would have the incentive to insist on ultimately receiving such information in order to establish the license defense.
A related point may be made about the reasonable expectations of a potential U.S. reseller of goods acquired abroad in sales made or authorized by a U.S. patentee. As to the reseller’s freedom from the pat-entee’s U.S. rights, the difference between a rule leaving the matter to the reseller’s affirmative proof of a license (express or implied) and a rule of presumptive exhaustion (subject to disproof by the U.S. paten-tee) is significant just when there are genuine uncertainties about whether a license could be established. But in that situation the reseller is not entitled to a strong expectation that it has permission to conduct its otherwise-infringing activities in the United States.
Conclusion
We hold that, when a patentee sells a patented article under otherwise-proper restrictions on resale and reuse communicated to the buyer at the time of sale, the patentee does not confer authority on the buyer to engage in the prohibited resale or *774 reuse. The patentee does not exhaust- its § 271 rights to charge the buyer who engages- in those acts—or downstream buyers having, knowledge of the restrictions— with infringement. We also hold that a foreign- sale of a U.S.-patented article, when made by or with the approval of the U.S. patentee, does not exhaust the paten-tee’s U.S. patent rights in the article sold, even when no reservation of rights accompanies the sale. Loss of U.S. patent rights based on a foreign sale remains a matter of express or implied license.
• Under our first holding, we reverse the district court’s judgment of non-infringement as to the Return Cartridges first sold in the United States. ' Under our second 'holding, we affirm the district court’s judgment of infringement as to the cartridges first sold abroad. The case is remanded for entry of a judgment of infringement for Lexmark and for any further proceedings necessary upon entry of. such judgment.
Costs awarded to Lexmark.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

. At oral argument, noting a reason the arrangement was not a lease, Lexmark stated that a Return Program Cartridge buyer is not absolutely required to return the cartridge to Lexmark. The restriction bars each of two acts: reusing the cartridge; transferring it to anyone else.

. Lexmark has not argued to us that the chip replacement and ink replenishment result in new articles, which would be outside the scope of the exhaustion doctrine. See Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 346, 81 S.Ct. 599 (1961) (Aro I).

. See, e.g., Global-Tech Appliances, Inc., 131 S.Ct. at 2065 n. 2; General Talking Pictures, 304 U.S. at 181-82, 58 S.Ct. 849; Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 38, 43 S.Ct. 254 (1923); Geneva Furniture Mfg. Co. v. S. Karpen & Bros., 238 U.S. 254, 257, 35 S.Ct. 788, 59 L.Ed. 1295 (1915); Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017 (1886); Blake v. Robertson, 94 U.S. 728, 733, 24 L.Ed. 245 (1876); Smith v. Nichols, 88 U.S. (21 Wall.) 112, 118-19, 22 L.Ed. 566 (1875); Bloomer, 55 U.S. (14 How.) at 549.

. 17 U.S.C. § 501(a) defines "an infringer of the copyright” as "[ajnyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122.” Section 106 gives the copyright owner “the exclusive rights to do and to authorize” certain actions, such as making copies and "dis-tributfing] copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership,” id. § 106(1), (3), but it declares that those rights are “[s]ubject to sections 107' through 122”—hence to section 109(a). Similarly, § 602(a) declares importation to be "an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.” Section 602 makes the importation bar subservient to § 109(a) by making it subservient to the § 106(3) right, which in turn is subservient to § 109(a), as the Supreme Court held in Quality King Distributors, Inc. v. L’anza Research International, Inc., 523 U.S. 135, 145, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998), and reiterated in Kirtsaeng, 133 S.Ct. at 1354755.

. Since 1999 Congress has provided a prior-use defense to infringement in certain circumstances and, in so doing, given a sale or disposition by a person having a prior-use defense the same exhaustion effect as a sale or disposition by a patent owner. See 35 U.S.C. § 273(d); id. § 273(b)(2) (2006). But Congress has not defined the underlying patent-exhaustion rule.

. Before 1952, the patent statute provided that “[ejvery person who purchases of the inventor, ... or with his knowledge and consent constructs any newly invented ... machine, or other patentable article, prior to the application by the inventor ... for a patent, or who sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased, without liability therefor.” 35 U.S.C. § 48 (1946); Rev. Stat. § 4899. That provision dated from 1870; a broader version (from 1839) did not depend on purchase from the inventor or construction with the inventor’s knowledge and consent. See Dable Grain Shovel Co. v. Flint, 137 U.S. 41, 42, 11 S.Ct. 8, 34 L.Ed. 618 (1890). The pre-1952 provision was viewed as a species of "implied license.” 3 Walker on Patents § 451, at 1682--83; Robinson, § 917, at 88. ,
The Patent Act of 1952 repealed the provision, the House Report briefly explaining that it was “[r]edundant and unnecessary.” H.R.Rep. No. 82-1923, at 72 (1952). No argument for the significance of the repeal has been -made to us—perhaps because (1) the provision did not depend on a sale; (2) it involved (pre-patent) conduct viewed as giving an "implied license,” which the Court has distinguished from “exhaustion,” Quanta, 553 U.S. at 637, 128 S.Ct.'2109; and (3) it was not authoritatively construed to apply even to sales subject to authority-denying restrictions.

. See, e.g., Horne v. Dep’t of Agric., — U.S. —, 135 S.Ct. 2419, 2428, 192 L.Ed.2d 388 (2015); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 535 U.S. 302, 327, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); New York Times Co. v. Tasini, 533 U.S. 483, 495-96, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001); Keystone Bituminous Coal Ass’n v. DeBenedictis, 480 U.S. 470, 500-01, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); United States v. Sec. Indus. Bank, 459 U.S. 70, 75-76, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); Fidelity-Phila. Trust Co. v. Smith, 356 U.S. 274, 278-79, 78 S.Ct. 730, 2 L.Ed.2d 765 (1958); Guggenheim v. Rasquin, 312 U.S. 254, 257-58, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Charles C. Steward Mach. Co. v. Davis, 301 U.S. 548, 580-81, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Henneford v. Silas Mason Co., 300 U.S. 577, 582, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

. See also Ark: Game & Fish Comm’n v. United States, — U.S. —, 133 S.Ct. 511, 520, 184 L.Ed.2d 417 (2012) (quoting Cohens); United States v. Alvarez, — U.S. —, 132 S.Ct. 2537, 2544-45, 183 L.Ed.2d 574 (2012); Illinois v. Lidster, 540 U.S. 419, 424, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004);. Reiter v. Sonotone Corp., 442 U.S. 330, 341, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); United Gas Improvement Co. v. Cont’l Oil Co., 381 U.S. 392, 404, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965); Wright v. United States, 302 U.S. 583, 593-94, 58 S.Ct. 395, 82 L.Ed. 439 (1938); Sterling v. Constantin, 287 U.S. 378, 400, 53 S.Ct. 190, 77 L.Ed. 375 (1932) (“the general language of the opinion must be taken in connection with the point actually decided”); Pacific S.S. Co. v. Peterson, 278 U.S. 130, 136, 49 S.Ct. 75, 73 L.Ed. 220 (1928); Bramwell v. U.S. Fid. & Guar.Co., 269 U.S. 483, 489, 46 S.Ct. 176, 70 L.Ed. 368 (1926) (“It is a rule of universal application that general expressions used in a court's opinion are to be taken in connection with the case under consideration.”).

. We do not see a sufficient basis to read Mitchell’s “without conditions” language as limited to sales in which title is not transferred until a condition is.fulfilled (sometimes called “conditional sales”). The terminology in Mitchell is not limited to “conditional sales,” and the Court later used the térm “conditions” more broadly, including in discussions of Mitchell. See Motion Picture Patents, 243 U.S. at 506, 514-15, 37 S.Ct. 416; A.B. Dick, 224 U.S. at 12, 16, 19, 32 S.Ct. 364; In re Paper-Bag Cases, 105 U.S. 766, 770-71, 26 L.Ed. 959 (1882). In any event, the language of Mitchell is just one part of the analysis, of which General Talking Pictures is the most significant precedent.

. In Chaffee, which involved Goodyear’s rubber patents, the Supreme Court rejected the defendants' invocation of'the Bloomer principle, again in a term-extension context, explaining that there was no evidence that, the defendants had ever received any authority to practice the patented invention. 63 U.S. (22 How.) at 222-24.

. Univis supports some of its broader statements about loss of patent rights with citations to some of the highly restrictive patent-misuse decisions—e.g., Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed, 371 (1938); Morton Salt Co. v. G.S. *750 Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); B.B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942)—that .were soon to culminate in the Mercoid decisions, Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64. S.Ct. 278, 88 L.Ed. 396.(1944), In the 1952 Patent Act, Congress, by adopting § 271(d), sharply limited the patent-misuse doctrine in response to that line of authority. See Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 204-15, 100 S.Ct. 2601 (1980); Rich, supra, at 21. In 1988, Congress limited the patent-misuse doctrine still further. See Illinois Tool Works, 547 U.S. at 41-43, 126 S.Ct. 1281.

. The government also cites Aro II, 377 U.S. at 497, 84 S.Ct. 1526, but that case involved no issue about restrictions in the terms of authorized sales.

. Lord Coke’s 1628 statement does not address the Statute of Monopolies, enacted just a few years earlier, to which American patent law has often been traced. See Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 18, 20, 7 L.Ed. 327 (1829); J.M. Robinson & Co. v. Belt, 187 *751 U.S. 41, 47, 23 S.Ct. 16, 41 L.Ed. 65 (1902). Lord Coke did discuss the Statute of Monopolies elsewhere. See Pennock, 27 U.S. (2 Pet.) at 20 (citing Edward Coke, Third Part of the Institutes of the Laws of England 184 (1644)).

. In Ninestar, this court rejected the argument that Quanta, 553 U.S. at 632 n. 6, 128 S.Ct. 2109, upset Jazz Photo. Quanta’s footnote 6 does not address or decide whether a foreign sale can trigger exhaustion. It makes a different point, státed in the textual assertion the footnote supports: "LGÉ has suggested no reasonable use for the Intel Products other than incorporating them into computer systems that practice the LGE Patents.” Id. at 632, 128 S.Ct. 2109; That assertion applies the Court's standard for when an article not covered by a patent nevertheless embodies the patent. Footnote 6 responds to footnote 10 in LGE’s brief, Brief for Respondent 21-22 n. 10, Quanta (No. 06-937), 2007 WL 4244683, which does not rely on a foreign sale of the Intel Products, but argues that the (first-sale) Intel Products do not embody the patents because they have substantial non-infringing uses, namely; wholly foreign making, selling,- and using of computers covered by the patents. Quanta’s footnote 6 responds that-such foreign acts with those computers "would still be practicing the patent, even if not infringing it," which is what counts for *756 the “embody” inquiry. 553 U.S. at 632 n. 6, 128 S.Ct. 2109.
Neither in footnote 6 nor elsewhere does Quanta refer to LGE’s final footnote, Brief, for Respondent 53 n. 19, in which. LGE cited Boesch, suggested that Intel’s sales might have been made abroad, and said that this was an open question for remand. Quanta replied that LGE had waived any foreign-sale-location contention, so that reversal, not remand, was required. Reply Brief for Petitioners 3 n. 2, Quanta (No. 06-937), 2007 WL 4613423. , The Court evidently agreed with Quanta. Without discussing Boesch or any issue about foreign-sale exhaustion law, the Court reversed, holding that “LGE can no longer assert its patent rights against Quanta.” 553 U.S. at 638, 128 S.Ct. 2109.

, The Second Circuit in Kirtsaeng had held that § 109(a) was inapplicable whenever the . copy had been made abroad, John Wiley & Sons, Inc. v. Kirtsaeng, 654 F.3d 210, 222 (2d Cir.2011), and Kirtsaeng’s “question presented” to the Supreme Court was “whether the copyright owner is entitled to control downstream sales just because it opts to manufacture the copies abroad.” Brief for Petitioner at i, Kirtsaeng (No. 11-697), 2012 WL 2641850. Kirtsaeng noted once in passing that a sale-location standard “sacrifices any pretense of fidelity to the statutory text" of § 109(a). Id. at 25. Wiley similarly recognized that "[t]he question presented is whether copies made outside the United States are ‘lawfully made under this title’ within the meaning of Section 109(a),” Brief for Respondent at i, Kirtsaeng (No. 11-697), 2012 WL 3836936. Wiley explained that the relevance of sale location was not being argued; and it nowhere argued that the sale of the books outside the United States, as opposed to their manufacture outside the United States, defeated exhaustion. Id. at 37-38.

. Congress has added certain limited extensions to foreign conduct. See 35 U.S.C. § 271(f). Those limited extensions are not applicable here and only strengthen the essential guarantee of a U.S.-market reward.

. See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 150-51, 109 S..Ct, 971, 103 L.Ed.2d 118 (1989) ("The federal patent system thus embodies a carefully crafted bárgain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years.”); Fed. Trade Comm’n, Evolving IP Marketplace 138-39 ("An important benefit of the patent system, in contrast to other methods of encouraging innovation, like direct prizes, is that it allows each invention to be valued directly through a market mechanism.”) (citing Kenneth W. Dam, The Economic Underpinnings of Patent Law, 23 J. Legal Stud. 247, 248-49 (1994); Joseph Farrell, John Hayes, Carl Shapiro & Theresa Sullivan, Standard Setting, Patents and HoldUp, 74 Antitrust L.J. 603 (2007)); see also Aro II, 377 U.S. at 507, 84 S.Ct. 1526 (patent “damages” tied to market valuation); Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 648, 35 S.Ct. 221, 59 L.Ed. 398 (1915) (reasonable royalty measures “the val *761 ue of what was taken" by-infringement, necessarily a market value).

. See, e.g., Robert Patrick Merges & John Fitzgerald Duffy, Patent Law and Policy: Cases and Materials 55 (5th ed.2011); Graeme B. Dinwoodie, William O. Hennessey, & Shira Perlmutter, International and Comparative Patent Law § 2.03 at 53-54 (2002); John Gladstone Mills III, A TrañsnatioHal Patent Convention for the Acquisition and Enforcement of International Patent Rights, 88 J. Pat. & Trademark Off. Soc’y 958, 958-59 (2006); Margaret A. Boulware, Jeffrey A. Pyle, & Frank C. Turner, An Overview of Intellectual Property Rights Abroad, 16 Hous. J. Int’l L. 441, 458-59 (1994).
A few dollar figures provide some context. For a U.S. patent, the minimum application fee is $2,560 (covering only the basic filing, search, examination, and issue fees). See USPTO Fee Schedule, U.S. Patent & Trademark Office, http://www.uspto.gov/leaming- and-resources/iees-and-payment/usptofee-schedule. As for lawyers’ charges for preparing and prosecuting a patent application, a 2015 report indicated that the median charge to prepare a minimally complex utility patent application is $7,000, with responses to Office Actions ranging .from $2,000 to $3,200 each. Am. Intellectual Prop. Law Ass’n, Report of the Economic Survey 29 (2015). For an example of filing fees for patents abroad, see European Patent Office, Schedule of Fees, http://www.epoline.org/myepoline_eofp_ portletapp-2.8.3/fees/pdf ?language=en.

. It has been noted that, as a matter of statutory text, "of the three principal forms of [federally- protected] intellectual property [copyright, patent, trademark], patent rights are the most explicitly territorial.” Donald S. Chisum, Normative and Empirical Territoriality in Intellectual Property: Lessons from Patent Law, 37 Va. J. Int’l L. 603, 605 (1997); see Dinwoodie et al., § 1.03 at 30.

. The application fee for a U.S. copyright registration is $35. Fees, Ú.S. Copyright Office, http://copynght.gov/about/fees.html. The same 2015 Survey that gives a median charge of $7,000 for legal services for preparing a minimally complex patent application (before the 'back-and-forth of prosecution occurs) gives a figure of $400 for services to prepare an application for a copyright registration. Am. Intellectual Prop. Law Ass’n, Report at 29.

. The "duration” language refers to a sentence in Rev. Stat. 4887 that tied certain U.S. patents’ expiration dates to those of related foreign patents. See Robinson, § 337, at 461. Congress deleted the provision in 1897. Act of Mar. 3, 1897, ch. 391, § 3, 29 Stat. 693; see H.R.Rep. No. 1923, at 38 (1952).

. Article 15.9,4 of the.U.S.-Morocco agreements says: "Each Party shall provide that the exclusive right of the patent owner to prevent importation of a patented product, or a product that results from patented process, without the consent of the patent owner shall not be limited by the sale or distribution of that product outside its territory.” A footnote attached to the provision adds: "A Party may limit application of this paragraph to cases where the patent owner has placed restrictions on importation by contract or other means.” United States-Morocco Free Trade Agreement, Morocco-U.S., June 15, 2004, 44 I.L.M. 544 (2005).

. Article 17;9.4 of the U.S.-Australia agreement says: "Each Party shall provide that the exclusive right of the patent owrter to prevent importation of a patented product, or a product that results from a .patented process, without the consent of the patent owner shall not be limited by the sale or distribution of that product outside its territory, at least where the patentee has placed restrictions on importation by contract or other means.” United States-Australia Free Trade Agreement, Aus-U.S., May 18, 2004, KAV 6422 (2005).

.Article 16.7.2 of the U.S.-Singapore agreement says: "Each Party shall provide a cause of action to prevent or redress the procurement of a patented pharmaceutical product, without the authorization of the patent owner, by a party who knows or has reason to know that such product is or has been distributed in breach of a contract between the right holder and a licensee, regardless of whether such breach occurs in or outside its territory." A footnote attached to that sentence adds: "A . Party may limit such cause of action to cases where the product has been sold or distributed only outside the Party’s territory before its procurement inside the Party’s territory.” United States-Singapore Free Trade Agreement, Sing.-U.S., May 6, 2003, 42 I.L.M. 1026 (2003).

. See also Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp., 690 F.Supp. 1339 (S.D.N.Y.1988) (interpreting settlement agreement to bar patentee Refac from suing purchasers of goods from Hattori).

. See, e.g., Mattias Ganslandt & Keith E. Maskus, Parallel Imports and the Pricing of Pharmaceutical Products: Evidence from the European Union, 23 J. of Health Econ. 1035, 1036 (2004) (discussing WTO General Council, Implementation of paragraph 6 of the Doha Declaration on the TRIPS Agreement and Public Health, Aug. 30, 2003, www.wto. org/englisb/tratop_e/trips_e/implem_para6_e. htm); Mainak Mazumdar & Dyuti S. Baner-jee, On Price Discrimination, Parallel Trade and the Availability of Patented Drugs in Developing Countries, 32 Int’l Rev. L. & Econ. 188, 189-93 (2012); Daniel Jacob Hemel & Lisa Larrimore Ouellette, Trade and Tradeoffs: The Case of International Patent Exhaustion, 115 Colum. L.Rev. Sidebar (forthcoming 2016), http://ssrn.com/abstract=2667338.

. See also 1 Grant Gilmore, Security interests in Personal Property § 3.7, at 81 (1965) .("For most lawyers the term [‘conditional sale'] came to have a reasonably precise meaning: a purchase money security transaction, subject in most states to statute, in which title to the goods was retained by the seller or his assignee until the full purchase price had been paid, usually in periodic installments.”).